556 So.2d 545 (1990)
In re ADOPTION OF B.G.S.
Nos. 89-CA-2522, 89-CD-2797.
Supreme Court of Louisiana.
February 5, 1990.
*546 Tracy R. Bishop, Guy W. Smith, Simon, Peragine, Smith & Redfearn, Mark McTernan, McTernan, Parr & Ramage, New Orleans, for appellant.
Evangeline G. Abriel, New Orleans, Catherine L. LaFleur, Loyola Law School Clinic, Robin Shulman, Attorney at Law, for appellee.
Guy W. Smith, Tracy Bishop, Simon, Peragine, Smith & Redfearn, New Orleans, for applicants.
Evangeline G. Abriel, Catherine L. LaFleur, Loyola Law School Clinic, Mark McTernan, McTernan, Parr & Ramage, New Orleans, Robin Shulman, for respondents.
DENNIS, Justice.
The question in this case is whether the State may, consistent with the constitutional guarantees of due process, empower the mother of an illegitimate child to terminate the parental rights of the unwed father of the child without notice and an opportunity to be heard.

I. Facts
R.S., an unwed sixteen-year-old girl, discovered that she was pregnant in June of 1989. She decided not to tell her parents, Mr. and Mrs. S., because of her strained relationship with them. R.S. informed V.L., her nineteen year-old boyfriend and father of the child, that she was pregnant, and he mentioned marriage. R.S. could not decide whether to marry V.L. Mr. and Mrs. S. soon became suspicious, and in July Mrs. S. took R.S. to see a gynecologist. The doctor confirmed that R.S. was approximately eight months pregnant. Several days later, Mr. and Mrs. S. met with V.L. and R.S. to discuss what should be done. Mr. and Mrs. S. suggested that the child be surrendered for adoption, and R.S. acquiesced. V.L. told them that while adoption sounded advisable, he wanted to think about it before making a final decision. Approximately one week later, V.L. informed R.S. and Mr. and Mrs. S. that he wanted to raise the child himself and was opposed to the adoption.
Mrs. S. and R.S. informed R.S.'s doctor that they intended to surrender the baby for adoption. The doctor informed one of her infertile patients, who was interested in an adoption, that R.S.'s baby might be available. The infertile patient employed an attorney to petition for a private adoption. *547 Meanwhile, V.L. also consulted a lawyer, who informed him that he must have his name placed on the baby's birth certificate in order to prevent the adoption.
When R.S. went into labor on August 8, 1989, she called V.L. He accompanied R.S. and her mother to the hospital. V.L. stayed with R.S. during her labor and visited with her after the birth. During labor, V.L. asked a hospital representative to place his name on the birth certificate and informed both the representative and Mrs. S. that he did not want to surrender the baby for adoption.
R.S. testified that she did not know prior to September, 1989, that she could place V.L.'s name on the birth certificate. Her father had taken charge of filling out the birth certificate application. V.L. asked Mr. S. to put his name on the certificate at the hospital, but Mr. S. refused. V.L. was not able to see R.S. alone at the hospital and her parents prevented their visits and discouraged their communications for some time afterwards.
R.S. gave birth to B.G.S., a baby girl, on August 8, 1989. The day after the baby's birth, August 9, V.L. filed an authentic act of acknowledgment with the clerks of court in both Orleans and Jefferson Parishes pursuant to La.R.S. 9:422.14. In the acknowledgment, he requested that his name be placed on B.G.S.'s birth certificate. During this time, V.L. was not allowed to see the baby because of the hospital's policy regarding babies that were scheduled to be adopted.
On August 16, R.S. and her parents executed an authentic act of surrender, and surrendered the baby to the prospective adoptive parents. V.L. was not a party to the act of surrender. On the same day, he contacted the office of vital statistics to inquire about having his name placed on the birth certificate, and he was given a form that required R.S.'s signature. On August 31, V.L. filed a "Petition for Habeas Corpus and/or Request of Information Concerning Status of B.G.S." in district court in Jefferson Parish. A hearing was held on this petition on September 7, at which time it was established that B.G.S. had been given to the adoptive parents, who remained anonymous. V.L. then amended his petition to make Tracy Bishop, the attorney for the adoptive parents, and the adoptive parents themselves (as John and Jane Doe) defendants, and to seek custody, visitation and/or the identity of the adoptive parents. He also filed a notice of his intent to oppose the adoption, and had this notice served on Ms. Bishop.
After R.S. left the hospital, despite Mr. and Mrs. S.'s interference, V.L. managed limited communications with her. V.L. repeated his requests to be named as father and renewed his vow to oppose the adoption and to raise the child himself. Finally, on September 21, R.S. executed the acknowledgment of paternity that V.L. had received from the office of vital statistics, and V.L. obtained a new birth certificate designating him as the father of B.G.S.
On September 22, the adoptive parents filed a petition for adoption in the Jefferson Parish Juvenile Court. V.L. timely moved to intervene and dismiss the adoption on the basis that his name was placed on the birth certificate and that he had not consented to the adoption pursuant to La.R.S. 9:422.4(A). On September 28 a hearing was held on V.L.'s September 7 motion for custody, visitation and/or revelation of the identity of the adoptive parents. The case was taken under advisement, and the district court ultimately stayed the proceedings pending the outcome of the adoption proceedings.
The juvenile court, following the provisions of the private adoption statute held that because the child was illegitimate and V.L.'s name did not appear on her birth certificate, V.L.'s right to veto the adoption terminated upon the surrender of the child by the mother, and that V.L.'s only recourse was to attempt to show that the adoption was not in the child's best interest in the adoption proceeding. After a further evidentiary hearing ordered by the court of appeal, however, the juvenile court declared unconstitutional the statute that prevented an unwed father from placing his name on his child's birth certificate without the mother's consent, held that the *548 surrender and adoption proceedings were invalid with respect to V.L. for lack of his consent, but upheld the mother's surrender of the child as terminating her parental rights.
In the meantime, on October 4, 1989, R.S. and V.L. were married after having obtained a waiver of parental consent pursuant to La.R.S. 9:212.
Pursuant to La. Const. art. V, § 5(D)(1), the adoptive parents appealed to this court from the juvenile court's judgment declaring a law unconstitutional on October 31. On R.S.'s motion, the juvenile court consolidated her appeal from the judgment upholding her surrender with this proceeding.[1] On November 2, we ordered the juvenile court to hold a best interest hearing to determine who should have custody of the child pending our decision. We clarified our order on November 10 to allow R.S. to intervene and to participate in the best interest hearing. The hearing was held on November 15. On November 17, following the guidelines set forth in In re J.M.P., 528 So.2d 1002 (La.1988), the trial judge awarded temporary custody of the child to her natural father, V.L., after finding this disposition to be in the child's best interests. The adoptive parents applied for a writ from this court to review the best interest ruling. We granted a writ to review the temporary custody ruling on December 6 and consolidated the matter with the pending appeals. These consolidated matters have been submitted after oral and written arguments.

II. Statutory Scheme Limiting Natural Rights of Parents
In the absence of a statute, the natural right of a parent to his child requires that his consent must be obtained before his parental rights and duties may be terminated and reestablished in adoptive parents. Roy v. Speer, 249 La. 1034, 192 So.2d 554 (1966); Green v. Paul, 212 La. 337, 31 So.2d 819 (1947); State ex rel. Simpson v. Salter, 211 La. 918, 31 So.2d 163 (1947); Adoption of Edwards, 369 So.2d 210 (La.App. 3d Cir.1979); Comment,
In re CDT: The Need For Greater Clarity in Private Adoption, 44 La.L.Rev. 845, 847 (1984). Consequently, unless parental rights have been severed by consent or lawful process, a parent has the right of withholding his consent to the adoption or the surrender of custody of his child to a third person. In re J.M.P., 528 So.2d 1002 (La.1988); State ex rel. Martin v. Garza, 217 La. 532, 46 So.2d 760 (1950); State ex rel. Birch v. Baker, 147 La. 319, 84 So. 796 (1920). The private adoption statutes purport to drastically limit this right by establishing a scheme whereby the mother of an illegitimate child may, without the consent of the natural father, terminate his right to withhold such consent by surrendering the child for adoption after refusing to put his name on the child's birth certificate.
When the identity of the father of an illegitimate child is not indicated on the birth certificate, the mother's act of surrendering the child for adoption "terminates all parental rights whatsoever," except for his standing to oppose the adoption at the best interest hearing. La.R.S. 9:422.8. Moreover, the father may not place his name on the birth certificate without the mother's consent. La.R.S. 40:34(B)(1)(a)(iv) and (h).
Consequently, the mother of an illegitimate child has the power to deprive the unwed father of his natural parental right to custody and to veto the adoption by withholding his consent. If she does so, the father loses all rights to the child, except in the unlikely event that the court later should find that the adoption is not in the child's best interest. Furthermore, even his standing to oppose the adoption is waived if the father does not file a formal acknowledgment of the child prior to the mother's act of surrender. La.R.S. 9:422.10(C) & 422.14(A).
The private adoption statute does not require that the non-designated unwed father be afforded any notice or a hearing prior to the termination of his parental rights by the mother's act of surrender of the child. See La.R.S. 9:422.8. After the *549 surrender, the statute expressly provides that the natural parents of the child shall not be served with notice of filing of the adoption petition. La.R.S. 9:425.

III. Due Process
Due process of law is guaranteed by both the Fourteenth Amendment to the United States Constitution and Art. 1, § 2 of the 1974 Louisiana Constitution. The central meaning of procedural due process is well settled: Persons whose rights may be affected by State action are entitled to be heard, and in order that they may enjoy that right, they must first be notified. Baldwin v. Hale, 1 Wall. 223, 17 L.Ed. 531 (1864). It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner. Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); Wilson v. City of New Orleans, 479 So.2d 891 (La.1985); State v. Woodard, 387 So.2d 1066 (La.1980).
When the due process clauses are invoked in a novel context, the established practice is to begin the inquiry with a determination of the precise nature of the private interest that is threatened by the State. See, e.g., Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); Cafeteria Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). The protections of due process come into play only if the private interest asserted is constitutionally cognizable. After the interest has been identified, a proper evaluation of the State's process can be made in light of the relative importance of the private and public interests at stake. Lehr v. Robertson, supra; Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). We therefore consider the nature of the interest in liberty for which the appellee claims constitutional protection and then turn to a discussion of the adequacy of the procedure that the State has provided for its protection.

A. Liberty Interest
The interest of a parent in having a relationship with his children is manifestly a liberty interest protected by the Fourteenth Amendment's due process guarantee. The United States Supreme Court has declared it "plain beyond the need for multiple citation" that a biological parent's right to "the companionship, care, custody, and management" of his children is a liberty interest far more important than any property right. Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982); Lassiter v. Department of Social Services, 452 U.S. 18, 27, 101 S.Ct. 2153, 2160, 68 L.Ed.2d 640 (1981). Accordingly, the interest of an unwed father in the children he has sired and raised is entitled to protection under the Due Process Clause. Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Even when the natural father has not lived continuously with his child, he enjoys a similar constitutional protection of his paternal interest when he develops and maintains a substantial relationship with his child by accepting responsibility for the child's future. Lehr v. Robertson, 463 U.S. at 262, 103 S.Ct. at 2993-94, 77 L.Ed.2d at 625; cf. Caban v. Mohammed, 441 U.S. 380, 389 n. 7, 99 S.Ct. 1760, 1766 n. 7, 60 L.Ed.2d 297, 305 n. 7 (1979).
The recognition of this protected interest evolved in four principal decisions of the Supreme Court. Lehr v. Robertson, supra; Caban v. Mohammed, supra; Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); and Stanley v. Illinois, supra.[2] Although these cases involved different *550 factual circumstances and legal issues, they "have produced a unifying theme," Michael H. v. Gerald D., ___ U.S. at ___, 109 S.Ct. at 2352, 105 L.Ed.2d at 118 (Brennan, J., dissenting): Although an unwed father's biological link to his child does not guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so. As the Court stated in Lehr v. Robertson:
When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "coming forward to participate in the rearing of his child,"... his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he "act[s] as a father toward his children."....
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development.
463 U.S. at 261-62, 103 S.Ct. at 2993, 77 L.Ed.2d at 626-27, quoting Caban v. Mohammed, 441 U.S. at 392, 389 n. 7, 99 S.Ct. at 1768, 1766 n. 7, 60 L.Ed.2d at 307, 305 n. 7 (emphasis added).
Because they had demonstrated such a commitment to their children, the fathers in Caban v. Mohammed, supra, and Stanley v. Illinois, supra, prevailed. Because they showed no such commitment, the fathers in Lehr v. Robertson, supra, and Quilloin v. Walcott, supra, lost.
An implied assumption of these decisions is that a fully committed unwed father of a newborn child has a constitutionally protected interest in his opportunity to develop a mutually beneficial emotional or psychological bond with his child. Lehr v. Robertson, 463 U.S. at 259-61, 103 S.Ct. at 2992-93, 77 L.Ed.2d at 625-26; see also In re Application of S.R.S., 225 Neb. 759, 408 N.W.2d 272 (1987); In re Baby Girl Eason, 257 Ga. 292, 358 S.E.2d 459 (1987); In re Adoption of Baby Boy D, 742 P.2d 1059 (Okla.1985), cert. denied, 484 U.S. 1072, 108 S.Ct. 1042, 98 L.Ed.2d 1005 (1988); Buchanan, The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson, 45 Ohio St. L.J. 313 (1984); Comment, Caban v. Mohammed: Extending the Rights of Unwed Fathers, 46 Brooklyn L.Rev. 95 (1979); Note, 29 Emory L.J. 833 (1980); Note, The Putative Father's Parental Rights: A Focus on "Family", 58 Neb. L.Rev. 610 (1979). This interest does not come into existence or is soon lost, however, if the father is unable to demonstrate that he is fit and committed to the responsibilities of parenthood. Moreover, he must show that he has taken concrete actions to grasp his opportunity to be a father and that there is a potential for him to make a valuable contribution to the child's development. Consequently, the mere existence of a biological link and fitness will not sustain the father's interest; it is defeasible if not preserved by dedicated, opportune fatherly action.
We reject appellants' interpretation of the Supreme Court cases as holding that only an unwed father with a developed relationship with his child may have a constitutionally protected interest in his parenthood. An unwed father of a recently born child may also "demonstrate[ ] a full commitment to the responsibilities of parenthood by `coming forward to participate in the rearing of his child'", Lehr v. Robertson, 463 U.S. at 261, 103 S.Ct. at 2993, 77 L.Ed.2d at 626, quoting Caban v. Mohammed, 441 U.S. at 392, 99 S.Ct. at 1768, 60 L.Ed.2d at 307, and "grasp[ ] that opportunity and accept[] some measure of responsibility for the child's future", Lehr v. Robertson, 463 U.S. at 262, 103 S.Ct. at 2993, 77 L.Ed.2d at 627. If he does so, he *551 has done all that the high court has required in order for an unwed father to have an interest worthy of constitutional protection. It may be more difficult for a recently born child's father to adduce objective proof of his commitment to parental responsibilities, but the due process guarantee is not so narrow as to permit a state to deny him the chance to do so.
Applying these principles, we conclude that the appellee, V.L., has asserted a liberty interest within the protection of due process. The appellants concede that he is the biological father of the child and that he is fit to be a parent. We find from the record that he has amply demonstrated his dedication to his parental responsibilities by indicating his opposition to the adoption before the child's birth; by formally acknowledging the child, seeking notice of any adoption proceedings, and opposing such proceedings one day after her birth; by attempting to have himself designated as father on her original birth certificate; by seeking custody through habeas corpus proceedings shortly after her birth; by actually inserting his name in her reissued birth certificate; by timely and actively pursuing this litigation; and by legitimating the child through his marriage to the mother. The record reflects that with his parents' help and his own employment he will be able to adequately lodge and support his wife and child. Prior to the birth of B.G.S. he was not called upon to provide for R.S. because she was a minor living with her parents. The evidence further indicates decisively that the child had not formed any psychological attachment to either adoptive parent by the time temporary custody was granted to the father. Accordingly, the opportunity was still open for him to contribute to her development and form a relationship with her.
Although we have no doubt that appellee has a protected interest under the Fourteenth Amendment, we believe that there are additional reasons to conclude that his liberty interest is also recognized as such by our state constitution. That charter was framed to "afford opportunity for the fullest development of the individual." Preamble, La. Const.1974. Prior to the adoption of the constitution, this court consistently held that a parent has a natural right to his biological child and that a child likewise has a right to his parent. Roy v. Speer, 249 La. 1034, 192 So.2d 554 (1966); Green v. Paul, 212 La. 337, 31 So.2d 819 (1947). Since then, both by recognizing the natural rights of parents to their children and by enforcing innominate fundamental rights of illegitimate children to inheritance and alimony against natural fathers or their descendants, we have implicitly recognized that the reciprocal rights and obligations of natural parents and children are among those unenumerated rights retained by individuals pursuant to La. Const. art. 1, § 24.
For example, in Maxwell v. Leblanc, 434 So.2d 375 (La.1983), we held that a natural father possesses a natural right to visitation with his child. Similarly, in Deville v. LaGrange, 388 So.2d 696 (La. 1980), we concluded that a natural father has a "paramount right" to custody of his children. In that case we stated:
There is no reason to restrict the applicability of these principles [of parental rights] to parent-child relationships which the law defines as legitimate. No one would argue that the weight of a mother's right to custody of her child should be reduced simply because she is not married to the child's father and has not performed a formal act of legitimation. There may be a misguided tendency to view the situation in a different light when the parent whose right is at stake is the father, but this is so only because of a failure to distinguish between the right which flows from the fact of parenthood, whether that parenthood is legitimate or not, and the possibility of a subsequent forfeiture of parenthood through abandonment or neglect, which may be greater when the relationship between the child's father and its mother, or between the father and the child, has not been formalized. Parenthood itself confers a right to custody, but that right of parenthood may *552 be forfeited by conduct which denies or rejects one's child.
388 So.2d at 698.
See also Smith v. Cole, 553 So.2d 847 (La. 1989) (recognizing obligation of natural father to provide support for natural child despite child's presumed legitimate filiation with another man); Griffin v. Succession of Branch, 479 So.2d 324 (La.1985) (recognizing inheritance rights of natural children despite their presumed legitimate filiation with another); Malek v. Yekani-Fard, 422 So.2d 1151 (La.1982) (recognizing possibility of mother proving child's filiation to a man other than her husband); Adoption of Baby Doe, 492 So.2d 508, 512 (La.App. 3rd Cir.), writ denied, 496 So.2d 353 (1986) (LaBorde, J., concurring); Comment, Child Custody Disputes between Parents and Non-Parents, 25 Loy.L.Rev. 71 (1979).
Accordingly, we believe that the interest of a biological parent in having an opportunity to establish a relationship with his child is one of those liberties of which no person may be deprived without due process of law under our state constitution. La. Const. Art. 1, § 2. Because the unwed father has a constitutionally cognizable liberty interest, he may invoke the guarantees of due process to protect that interest. Where procedural due process must be afforded because a "liberty" interest is within the Fourteenth Amendment's protection, there must be determined "what process is due" in the particular context. Smith v. Organization of Foster Families, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977). Moreover, a similar inquiry must be made under the guarantee of our state constitution. Wilson v. City of New Orleans, supra.

B. What Process Is Due?
Before a person is deprived of a protected interest, he must be afforded some kind of hearing, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event. Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). This hearing need not be a full-blown adversarial trial; the hearing required is only one "appropriate to the nature of the case." Mullane v. Central Hanover Bank & Trust Co. 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950); Wilson v. City of New Orleans, 479 So.2d 891 (La.1985); see also Friendly, "Some Kind of Hearing", 123 U.Pa.L.Rev. 1267, 1278-79 (1975). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).
The United States Supreme Court has indicated that identification of the specific dictates of due process under the federal constitution generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Consideration of the procedure employed by the State in terminating the natural father's parental rights in light of these three factors requires the conclusion that those procedures do not satisfy constitutional standards.
In interpreting our own state constitution, of course, we are not bound by this balancing approach. This test was almost certainly not specifically intended by the framers who had drafted our constitution some three years before Mathews v. Eldridge was decided, and there is no indication that the framers intended for our state's constitutional guarantees to fluctuate with the vicissitudes of federal constitutional interpretation. Nevertheless, we have employed this balancing test in deciding what procedure is due under the state due process clause, see Wilson v. City of New Orleans, supra, and we will continue to do so as long as its application promotes the goals of that safeguard.
*553 As we concluded earlier in this opinion, a natural father's interest in establishing and maintaining a relationship with his child is cognizable and substantial if he has dedicated himself to his paternity when there is yet time for him to make a valuable contribution to the child's development. The risk of an erroneous deprivation of such an interest is not insubstantial, given the statute's complete reliance upon the natural mother to decide whether the natural father shall be notified or consulted prior to the termination of his interest. The due process clauses will not shield a natural father from a deprivation properly imposed, but it disserves both his interest and the interest of the State if his deprivation is in fact unwarranted. The risk of error or unfairness caused by human fault in the termination process is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference. Cf. Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); Wilson v. City of New Orleans, supra. As we noted earlier, under the statute the appellee was not afforded notice or an opportunity to present his case before his parental rights were terminated. Accordingly, appellee was not given any process before this termination, unless it can reasonably be presumed that when an unmarried mother fails or refuses to consent to the designation of the putative unwed father on the child's birth certificate that the putative father is not the biological father, not fit to be a parent, or not committed to his parental responsibilities.
We do not think any of these presumed facts may be rationally inferred from the mother's inaction. Nor does the state's interest in facilitating adoptions justify the use of such presumptions. It may be that most unwed fathers whose names are left off birth certificates are unsuitable and neglectful parents or persons whose biological relationship to the child is in doubt. But all unwed fathers are not in this category; some are wholly suited to have custody and committed to their responsibilities. From our review of the record, we are convinced that appellee for one is ready, willing and able to assume his parental responsibilities.
The United States Supreme Court declared a similar presumption unconstitutional as depriving an unmarried father of his child without due process of law. Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). In that case the court held that a state could not merely presume that unmarried fathers in general and petitioner in particular were unsuitable and neglectful parents; rather, parental unfitness must be established on the basis of individualized proof. The high court stated:
[I]t may be argued that unmarried fathers are so seldom fit that Illinois need not undergo the administrative inconvenience of inquiry in any case, including Stanley's. The establishment of prompt efficacious procedures to achieve legitimate state ends in a proper state interest worthy of cognizance in constitutional adjudication. But the Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones.
Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand.

Stanley v. Illinois, 405 U.S. at 656-57, 92 S.Ct. at 1215, 31 L.Ed.2d at 561-62.
We conclude that the due process clauses mandate a similar result here. As the Supreme Court observed in Stanley, the State's interest in caring for the natural father's child is de minimus if he is shown to be a fit and dedicated father. The statutory *554 scheme relies on the presumption rather than requiring proof of his unfitness or disinterest solely because it is more convenient to presume than to prove. Under due process of law that advantage is insufficient to justify refusing a father a hearing when the issue at stake is the termination of his parental rights.
It is evident that the statutory method of terminating the natural parent's interest in his child falls short of due process requirements in several respects. Under the balancing approach outlined in Mathews v. Eldridge, some procedure for entertaining an undesignated natural father's complaints prior to termination of his protected interest is required to afford reasonable assurance against an erroneous or arbitrary deprivation. The private adoption system in general, and La.R.S. 9:422.8 in particular, does not provide for notice to the father that his parental rights may be terminated, an opportunity to respond at least informally, or a neutral decision maker to decide whether the father has forfeited his opportunity to rear the child.

1. Notice
Prior to an action which will affect an interest in life, liberty or property protected by the Due Process Clause, a State must provide "notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865, 873 (1950); see also Greene v. Lindsey, 456 U.S. 444, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982); Walker v. City of Hutchinson, 352 U.S. 112, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956).
The statute here does not comport with constitutional requirements because it does not provide for any notification procedure "reasonably calculated" to inform an undesignated natural father of the "pendency of an action" for termination of his parental rights and the availability of "an opportunity to present [his] objections." Mullane v. Central Hanover Bank & Trust Co., supra. While it is true that the identities of some unwed and undesignated natural fathers may be difficult or impossible to discover, this difficulty cannot be used to deprive notice to a father whose identity is readily discoverable. At the very least, the State, which has created the possibility of the termination of the father's interests by statute, must provide notice to unwed fathers who come forward timely to make their identities known and to assume their responsibilities and assert their rights as parents. Of course, it follows from the nature of the unwed father's opportunity interest that it may be lost if he does not timely grasp his chance. See Lehr v. Robertson, supra; Quilloin v. Walcott, supra. Consequently, if the State has clear and convincing evidence of prior termination, consent, or waiver severing the father's interest, or if the State, based on trustworthy evidence, may assume from the combination of a passage of time and assumption of parental responsibility of another, that the father's interest has lapsed, then the father's biological connection alone does not require the State to notify him of proceedings because he has already lost his opportunity. See Buchanan, 45 Ohio St. L.J. at 368.
Here, the State has no such evidence and may make no such presumption. The father took steps to insure that his identity would be known by filing a formal acknowledgment in the public records; in the future unwed fathers may also make their identities and locations known through use of the putative father registry established by Act 361 of 1989. Regardless of the particular method used, when the father's identity is known or readily discoverable, he must be given notice of any proposed action to terminate his rights unless there is clear and convincing evidence his interest has lapsed. As no such notice was given appellee, and his interest had not lapsed, he was unconstitutionally deprived of the notice which was his due.

2. Form of Hearing or Procedure
The State contends that the undesignated natural father's opportunity to oppose the adoption and to attempt to show that it is not in the child's best interest is *555 all the process that is due.[3] We disagree. The best interest hearing does not afford the natural father any opportunity to object to the termination of his rights to claim custody of right and to veto, or withhold consent to, the adoption. The sole issue at such a hearing is the interest of the child, not any interest of the natural parents. The natural father is not entitled to object to the deprivation of his rights at the best interest hearing; he is merely given a chance to show that the best interests of the child will not be promoted by the adoption. Furthermore, the best interest hearing occurs after he has been deprived of his rights, not before. While many controversies have raged about the due process clause, it is fundamental that except in emergency situations (and this is not one) due process requires that when a State seeks to terminate a protected interest, it must afford notice and an opportunity for hearing appropriate to the nature of the case before the termination becomes effective. Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). Accordingly, we find that there must be some opportunity for a hearing, at which it should be determined whether the natural father has attempted to exercise his right to establish and maintain a relationship with the child, or alternatively whether he has waived that right.
We reject any suggestion that we need not consider the propriety of the termination of V.L.'s rights to custody and to veto the adoption because he might be able to regain his child by defeating the adoption. The suggestion is that if V.L. has been deprived of a protected interest without due process, the deprivation is immaterial and not legally cognizable for the purposes of the Fourteenth Amendment because it may yet be rectified. As the Supreme Court observed in Stanley v. Illinois, however, we have not "embraced the general proposition that a wrong may be done if it can be undone. Cf. Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). Surely, in the case before us, if there is delay between the doing and the undoing petitioner suffers from the deprivation of his child[], and the child[] suffer[s] from uncertainty and dislocation." 405 U.S. at 647, 92 S.Ct. at 1210-11, 31 L.Ed.2d at 556. The rather sparse opportunity of an unwed father whose children have been taken away to regain them by defeating the adoption upon a showing that it is not in the best interests of the children does not satisfy the requirements of procedural due process.

3. Neutral Decision Maker
The essential guarantee of the Due Process Clause is fundamentally fair procedure for the individual in the resolution of the factual and legal basis for government actions which deprive him of life, liberty or property. Therefore, there must be some type of neutral and detached decision maker, be it judge, hearing officer or agency. Wilson v. City of New Orleans, 479 So.2d 891 (La.1985). The Supreme Court has consistently held that a "fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). This requirement applies to agencies and government hearing officers as well as judges. Withrow v. Larkin, 421 U.S. 35, 46, 95 S.Ct. 1456, 1463, 43 L.Ed.2d 712 (1975); Gibson v. Berryhill, 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488 (1973). "[A]n impartial decision maker is essential" to due process. Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970).
There is no such neutral decision maker in the present case. Under La.R.S. 9:422.8, the person who decides whether the unwed father's rights will be terminated is the natural mother. She is subject to competing physical, mental and emotional pressures, *556 and she can hardly be said to be neutral. In fact, if a mother wishes to surrender her child for adoption, it is in her best interest to omit the father's name from the birth certificate so that he will be unable to block the adoption of the child. The lack of a hearing, combined with the placement of decision in the hands of a potentially adverse decision maker, violates the most basic principles of due process under both our state and federal constitutions.
The requirement of a neutral and detached decision maker should not impose a great burden on the State. Such decision makers need not be judges, magistrates or persons with great expertise. The deciding officer's function should be to determine that the proposed termination of the natural father's interest is warranted (i.e., that the father in reality has already forfeited his protected interest by his lack of commitment to his paternity by way of personal, financial, or custodial responsibility, see Michael H. v. Gerald D., ___ U.S. ___, ___, 109 S.Ct. 2333, 2360, 105 L.Ed.2d 91, 128 (1989) (White, J., dissenting)), to consider informal oral or written responses, and to cancel terminations or order evidentiary hearings when there is just cause. Wilson v. City of New Orleans, 479 So.2d at 902.

IV. Resolution of Present Case
Pursuant to the order of this Court, the juvenile court conducted a best interest hearing and made findings of fact and conclusions of law. The court found that R.S. and V.L. are the biological parents of B.G.S. and that each is fit to be the child's parent; that B.G.S., who was three months old, had not developed a psychological bond with either prospective adoptive parent; and that it is in the best interests of the child for her father, V.L., to have custody. The juvenile court recognized in its written reasons that V.L. had legitimated the child by marrying her mother, but the court concluded that it could not find that it was in the best interests of the child for her mother to share custody because R.S. had surrendered the child for adoption and had failed to timely revoke her consent. The prospective adoptive parents argue, by the same token, that she did not acquire the rights or the responsibilities that normally flow to a person who legitimates her child by marriage because she had terminated all such rights by surrendering the child for adoption. We disagree with this argument and, in this respect, with the juvenile court's judgment. In all other respects, however, the evidence supports the juvenile court's conclusions.
We conclude that V.L. was deprived of his protected parental interest in and right to his child in violation of the federal and state due process guarantees. When V.L. demonstrated by virtue of his biological link, fitness and parental commitment that he had a constitutionally protected interest in his relationship with B.G.S. of which he had been deprived without due process, he was entitled to have the surrender declared invalid and the adoption proceedings dismissed. Consequently, the surrender could not have its normal effects of transferring custody and terminating parental rights pursuant to an adoption proceeding. Although the surrender might have allowed the court to consider withholding custody from the surrendering mother if she had been unfit or if the father had been unwilling to share custody with her, happily neither is the case here. Therefore, in this case the surrender and the adoption proceedings shall be vacated and shall have no effect on the parental rights of R.S. or V.L. whatsoever. That being the case, there was, of course, no impediment to the legitimation of B.G.S. by the marriage of her parents and their acknowledgment of her as their child. La.C.C. art. 198.

V. Procedures to Satisfy Due Process

A. A Legislative Alternative to the Present Scheme
Adoption in Louisiana is a creature of statute, and the ultimate responsibility for establishing the necessary procedures to effect adoptions belongs to the Legislature. Ball v. Campbell, 219 La. 1076, 55 So.2d 250 (1952); State ex rel. Harner v. Karpe, 151 La. 585, 92 So. 124 (1922). In establishing these procedures, however, the Legislature may not violate the fundamental rights of natural parents. Because there have been no previous decisions in this *557 area, we offer the following ideas regarding potential safeguards to protect natural parents. This is not the only alternative that would satisfy due process, and we do not presume to prescribe the procedures that must or should be adopted by statute. Rather, these guidelines are intended as illustrations of a possible statutory scheme that would allow private adoptions while adequately protecting the rights of the natural parents.
In our opinion due process requires at least rudimentary precautions against unfair or mistaken classification of persons as unfit or disinterested parents and against arbitrary deprivation of their protected interests in relationships with their children. For example, the natural father could be given written notice by mail of a proposed order approving surrender of the child and termination of his interest, if his identity and whereabouts are ascertainable with reasonable diligence. And he could be given a brief period before issuance of the order within which to make an informal oral or written statement why the child should not be surrendered and his rights not be terminated. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental requirement of due process. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); see also Friendly, 123 U.Pa.L.Rev. at 1281. We stop short of construing the due process clauses to require that the natural father be given the opportunity to confront and cross examine witnesses, or to call witnesses. To impose in each case even truncated trial-type procedures might well overwhelm administrative facilities. Requiring effective notice and informal discussion permitting the natural father to oppose the termination of his interest would provide a meaningful hedge against erroneous or unfair action without being unduly burdensome. Cf. Goss v. Lopez, 419 U.S. at 593, 95 S.Ct. at 740, 42 L.Ed.2d at 739; Wilson v. City of New Orleans, 479 So.2d at 901. Of course, less formal initial pre-termination hearings heighten the importance of post-deprivation review of those informal decisions. The Supreme Court has upheld informal pre-deprivation procedures when the person whose rights are terminated may ultimately have his claims considered by a court. See, e.g., Cleveland Bd. of Educ. v. Loudermill, supra; Mathews v. Eldridge, supra. When, as here, the interests at stake are fundamental, we believe that there must be an opportunity for judicial review, although this review may take place after the natural father's rights are administratively terminated.
By Act 361 of 1989, the Legislature has established a putative father registry. Under this Act, anyone who claims to be or is adjudicated to be the natural father of an illegitimate child can be identified as such by consulting the registry. Recordation in the registry creates a rebuttable presumption that the person filing is the father of the child. The Act provides, however, that it shall not be construed to require that anyone "obtain the consent of the putative father for the adoption of the child." While this Act may be helpful in ascertaining the identities of natural fathers, if such fathers file with the registry, it alone is patently insufficient to meet the basic requirements of due process.
A similar registry has been established by the State of New York. A man who files with the New York registry and thus demonstrates his intent to claim paternity of a child born out of wedlock is entitled to receive notice of any proceeding to adopt that child. The purpose of the New York statute, however, appears to be to enable the person served pursuant to it merely to present evidence to the court relevant to whether the adoption is in the best interests of the child, rather than to allow him to assert his right to veto the adoption. See Lehr v. Robertson, 463 U.S. at 251 n. 5, 264 n. 20, 103 S.Ct. at 2988 n. 5, 2994 n. 20, 77 L.Ed.2d at 620 n. 5, 628 n. 20.
The New York registry law survived both a due process and an equal protection challenge in Lehr v. Robertson, supra. The law was not really tested, however, because the natural father in that case actually did not have a protected interest in the child due to having rarely seen and *558 never supported the child in the two years since her birth. 463 U.S. at 261, 103 S.Ct. at 2993, 77 L.Ed.2d at 626. Furthermore, the petitioners for adoption were the natural mother and the man she had married after the child's birth. The stepfather had acted as the father of the child for over a year before the adoption petition was filed. 463 U.S. at 250, 103 S.Ct. at 2987, 77 L.Ed.2d at 619. Had the prospective adoptive parents been strangers seeking to adopt the child and had the father not forfeited his protected interest in the child it is obvious that the result could have and should have been different. Finally, if the father had been deprived of an interest protected by the constitution without due process of law, it is difficult to see how this wrong could be remedied by merely enabling him to register his name and receive notice of an adoption proceeding at which he could only present evidence to the court relevant to the best interests of the child.
The Louisiana registry law affords the unwed father even less protection; it does not even require that he be notified of an adoption proceeding. In light of the fact that the New York statute, even with its notice provisions, might well not survive a constitutional attack, we do not believe that the Louisiana registry statute, which has no such provisions, is sufficient in itself to protect the natural father's interests. Accordingly, while the registry law may prove to be a helpful adjunct to a constitutional child-surrender and parental right-termination procedure, it is no substitute for notice and some kind of pre-termination procedure before a neutral decisionmaker.

B. Interim Procedure For Courts
The juvenile court correctly concluded that a part of the statutory scheme for effecting surrenders for private adoptions is unconstitutional. The constitutional deficiencies are in the statute allowing termination of the father's rights, La.R.S. 9:422.8, however, rather than in the birth certificate statute, La.R.S. 34:40, as found by the juvenile court. Based on this unconstitutional termination, the private adoption statutes allow adoptions to go forward against the wishes of the natural father, without affording him either notice or an opportunity to be heard by a neutral decision maker.
Having determined that this statutory termination method is unconstitutional insofar as it may be used to deprive an unwed father of his child in whom he has a protected interest, this court cannot simply stop abruptly without supplying a temporary constitutional procedure by which the surrender of children for private adoptions may be continued. As noted above, establishing a procedure for terminating parental rights is ultimately a matter for the Legislature. In the interim, however, this court must formulate minimum safeguards to be followed by the courts in order to avoid due process violations.
Until the legislature adopts some kind of constitutionally acceptable procedure, the courts must observe certain minimum safeguards in administering the present private adoption system. An unwed father's right to veto the adoption of his child cannot be terminated or declared forfeited without prior notice and a hearing on this issue. However, provisional transfer of custody of the child to the prospective adoptive parents may be made upon surrender of the child by the natural mother for adoption in accordance with the present statutory scheme. We do not believe that due process requires that the transfer of temporary physical custody await the pre-deprivation procedure except in the unlikely event that the father has actual custody. If the natural father, in response to notice of the proposed termination of his rights, makes known his possible constitutional interest in the child and his opposition to the adoption, the trial court must decide whether the natural father has lost, waived or otherwise had his constitutional rights terminated. This decision must be rendered rapidly to prevent the defeat of his potential rights by the law's delay. See In re J.M.P., supra. If the natural father does not respond or cannot be located within a reasonable time, then the court may terminate his parental rights and continue with the adoption proceedings. On the other hand, if the father *559 appears and demonstrates that he is fully committed to his parental responsibilities and has grasped the opportunity to commence a relationship with his child, the court must uphold his parental rights, vacate the surrender and dismiss the adoption.
A related problem is whether the courts should give this declaration of unconstitutionality retroactive effect to invalidate prior terminations of parental rights under La.R.S. 9:422.8. Numerous private adoptions have occurred in this state since the statute at issue was enacted. In those proceedings, the parties relied upon the statute as enacted by the legislature in attempting to create stable family relationships for children. Indeed, a lower court had previously held a similar statutory procedure constitutional, albeit in a different context. Collins v. Division of Foster Care, 377 So.2d 1266 (La.App. 4th Cir. 1979).[4] In perhaps no other area of the law is the interest in finality and certainty greater than in the area of adoption. Consequently, if our holding were to be given full retroactive effect, it could lead to the disruption of established, settled families in favor of the placement of children with what now amount to strangers. Considering the interests of justice, stability of institutions and administrative convenience we conclude that our due process interpretation shall be applied prospectively only, except that it shall have retroactive effect in the case at bar and in any case pending below in which a natural father with a protected interest has filed a pleading asserting his interest in the child prior to an interlocutory decree of adoption.

Decree
For the reasons assigned, the judgment of the trial court is amended to provide that the adoption proceedings are dismissed with prejudice at petitioners' cost, B.G.S. is declared to be the legitimate child of V.L. and R.S., and B.G.S. is placed in the permanent care, custody and control of V.L. and R.S. as her lawfully wedded parents. It is further ordered, adjudged and decreed that the juvenile court's declaration of unconstitutionality is modified to declare La.R.S. 9:422.8 unconstitutional insofar as it deprives unwed fathers with protected interests in their children of parental rights without prior notice and an opportunity to be heard before a neutral decision maker as more fully set forth in this opinion.
AMENDED AND AFFIRMED.
MARCUS and LEMMON, JJ., concur.
NOTES
[1] In order to make certain that R.S.'s complaints are properly before this court we treat her appeal as an application for a writ granted under our supervisory jurisdiction.
[2] A plurality of the court has espoused a different view of the protected interest in a fifth case, Michael H. v. Gerald D., ___ U.S. ___, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989). Four justices would hold that a protected liberty interest is created not by biological fatherhood plus an established parental relationship but is based on the historic respect traditionally accorded to the relationships that develop within the unitary family. Their departure from the previous analysis evidently was prompted by the extreme factual situation: Michael H. sought to establish his paternity and right to visitation with a child presumed to be Gerald D.'s daughter because Gerald was married to and living with the mother at the time of birth. An analysis of the various separate opinions, however, reveals that a majority of the court has not abandoned its traditional approach of focusing first upon the precise nature of the interest threatened by the state, i.e., the interest of the unwed father in his child. Moreover, even if the plurality's departure should become ascendant, it does not appear that it would lead to different results under the more normal factual pattern of the present case.
[3] We set to one side the problem that is created by the fact that in order to obtain a chance to participate in the best interest hearing the father must anticipate the mother's surrender of the child for adoption and formally acknowledge the child before her act. See La.R.S. 9:422.10(C) & 422.14(A).
[4] In Collins, the court of appeal upheld a statute allowing surrender of a newborn by the mother alone, but the father in that case had failed to acknowledge the child until almost a year after its birth. Significantly, the statute in force at that time, former La.R.S. 9:404, provided that a surrender by the mother terminated all parental rights only as to children born out of wedlock who had not been "formally acknowledged or legitimated by the father." See 377 So.2d at 1269.