HIGGINBOTHAM, J.
|2In this adoption case, the prospective adoptive parents appeal the judgment of the juvenile court in favor of the natural father, ordering that the adoption cannot take place without his consent.
FACTUAL AND PROCEDURAL HISTORY
In 2012, while married, but separated from her husband B.T., J.T. began a dating relationship with C.C. J.T. and C.C. lived together with J.T.’s mother for approximately six months, and during that time J.T. became pregnant. J.T. told C.C. she was pregnant in January or February 2013, and J.T. discussed placing the baby for adoption. C.C. opposed the adoption, and he informed J.T. that if she did not want to care for the child, he would. C.C. attended one sonogram with J.T. and following the sonogram posted the picture on Facebook with the caption “It’s gonna be a boy!!!”
J.T. and C.C.’s relationship ended in April 2013. A few months later, in June, J.T. untruthfully informed C.C. that she had suffered a miscarriage. J.T. perpetuated this falsehood through Facebook correspondence with C.C.’s mother that stated, “Our DNA wasn’t [compatible] and it [made] the placenta not strong enough to support the baby.” The day after J.T. told C.C. she had a miscarriage, C.C. went to J.T.’s mother, K.C., upset about what he thought happened. K.C. did not tell C.C. that J.T. was still pregnant, but instead stated that the issue was between C.C. and J.T.
In July 2013, prospective adoptive parents A.S. and M.S. came from their home in Florida to discuss the adoption of J.T.’s baby and to spend the day with J.T. and her husband B.T. in New Orleans. After that meeting, B.T. executed a voluntary act of surrender on August 4, 2013. On September 11, 2013, the baby boy, G.T., was born. A.S. and M.S. were at the hospital for the birth, and M.S. cut G.T.’s Isumbilical cord. G.T. left the hospital with A.S. and M.S. and moved to their home in Florida.
*108 On September 17, 2013, J.T. executed an act of surrender and listed the biological father as “unknown.” She also signed an affidavit that stated she did not know who the father was or his whereabouts because she became pregnant after a one-night stand.
In January 2014, approximately 4 months after the birth of G.T., C.C. heard from a friend that J.T. did not have a miscarriage and that the baby boy was alive. C.C-.’s friend showed him a picture of J.T. with G.T. at the time of G.T.’s birth. On February 19, 2014, C.C. registered with the putative father’s registry regarding G.T., and on August 1,¡ 2014,. C.C. filed a “Petition of Intervention & Opposition to Adoption.”
A hearing on C.C.’s intervention was set for November 14, 2014, but it was continued at the request of tlie adoptive parents and reset for December 19, 2014. Following paternity testing and at the conclusion of the December 19, 2014 hearing, the juvenile court declared C.C. to be the father of G.T. and' ordered that the adoption could not proceed without his consent. A written judgment was signed on January 9, 2015, and the juvenile court further ordered that the child was “not certified for placement for adoption.” It is from this judgment that A.S. and M.S. appeal.
STANDARD OF REVIEW
The standard of appellate review of judgments in adoption cases is the “manifest error” standard. In re 33,-766 (La.App.2d Cir.3/7/00), 754 So.2d 425, 427, writ denied, 2000-0797 (La.5/12/00), 762 So.2d 14. It is well-settled that a court of appeal may not set aside a trial court’s findings of fact in the absence of “manifest error,” which in its simplest terms means “clearly wrong.” Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the [¿appellate court may feel that its own evaluations and inferences are as reasonable as those of the trial court. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
LAW AND ANALYSIS
The interest of an unwed father in the children he has sired and raised is protected under the Due Process Clause in the Fourteenth Amendment to the United States Constitution. In re Adoption of B.G.S., 556 So.2d 545, 549 (La.1990). In cases where the father has not lived continuously with the child, his paternal interests are protected when he develops and maintains a substantial relationship with his child by accepting responsibility for the child’s future. Id. This constitutional protection extends to unwed biological fathers of newborns; “[A] fully committed unwed father of a newborn child has a constitutionally protected interest in his opportunity to develop a mutually beneficial emotional or psychological bond with his child.” Id., 556 So.2d at 550, citing, Lehr v. Robertson, 463 U.S. 248, 259-61, 103 S.Ct. 2985, 2992-93, 77 L.Ed.2d 614 (1983). The Lehr court characterized that commitment as follows:
When an unwed father demonstrates a full commitment to the responsibilities of parenthood by “com[ing] forward to participate in the rearing of his child,” ... his interest in personal contact with his child acquires substantial protection under the [D]ue [P]rocess [C]lause. At that point it may be said that he “act[s] as a father toward his children.” — The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsi *109 bility for the child’s future, he may enjoy the blessings of the parent-child relationship and' make uniquely valuable contributions to the child’s development. [Footnote and citations omitted.]
Lehr, 463 U.S. at 261-62, 103 S.Ct. at 2993. “This interest does not come into existence or is soon lost, however, if the father is unable to demonstrate that he is fit and committed to the responsibilities of parenthood.” In re Adoption of B.G.S., 656 So.2d at 550. “[H]e must show that he has taken concrete actions to grasp his [ ^opportunity to be a father and that there is a potential for him to make a valuable contribution to the child’s development.” Id, Consequently, simply showing a biological relationship , and fitness is not enough to sustain the father’s interest. Id.
These precepts are now codified in Louisiana law and expressly stated in La. Ch. Code art. 1138, which governs hearings concerning opposition to a proposed adoption, as well as the establishment of parental rights. Louisiana Children’s Code article 1138 provides, in pertinent part:
A. At the hearing of the .opposition, the alleged or adjudicated father must establish his parental rights by acknowledging that he is the father of the child and by proving that he has manifested a substantial commitment to his parental responsibilities and that he is a fit parent of his child.
B. Proof of the father’s substantial commitment to his parental responsibilities requires a showing, in accordance with his means and knowledge of the mother’s pregnancy or the child’s birth, that he either:
(1) Provided financial support, including but not limited to the payment of consistent support to the mother during her pregnancy, contributions to the payment of the medical expenses- of pregnancy and birth, or contributions of consistent support of the child after birth; that he frequently and consistently visited the child .after birth; and that he is now willing and able to assume legal, and physical care of the child.
(2) Was willing to provide such support and to visit .the child and that he made reasonable attempts to manifest, such a parental commitment, but was thwarted in his efforts by the mother or her agents, and that he is now willing.and able to assume legal and physical care of the child.
The burden of proof is upon the claimant father to demonstrate that his parental rights should be recognized. This burden is. three-fold, requiring that the claimant father (1) acknowledge paternity in open court, (2) prove' his efforts to seize his parental “opportunity” interest, and (3) prove his present fitness for custody. In Re McLarrin, 38,616 (La.App.2d. Cir.2/4/04), 865 So.2d 317, 323, writ denied, 2004-0595 (La.3/24/04), 871 So.2d 331. The burden of proof is on the father to prove these three elements by a preponderance of the evidence. Matter of R.E., 94-2657 (La.11/9/94), 645 So.2d 205, 207; In re Adoption of S.C.D., 99-455 (La.App. 5th Cir.9/28/99), 742 So.2d. 1058, 1060-61, writ denied, 99-3082 (La.11/3/99) 748 So.2d 1144.
A.S. and M.S. do not dispute that C.C-. acknowledged his paternity, nor do they challenge C.C.’s fitness for custody. They do, however, challenge that C.C. proved that he seized his parental opportunity. Specifically, A.S. and M.S. contend that C.C. became aware that -G.T. was .alive in January 2014, -but did not -file anything or contact the adoptive parents until seven months later -in August 2014.. Additionally, they .argue that the juvenile court was “blinded by the Mother’s,deception prior to the child’s date of birth and failed.to consider [C.C.’s] lack of action after he *110 admitted to knowing the child was alive in January 2014.”
At the conclusion of the trial, the juvenile court issued extensive and well-considered “Written Reasons for Judgment.” The juvenile court found that, in accordance with La. Ch. Code art. 1138, “[C.C.] demonstrated that he manifested a substantial commitment to his parental responsibilities to the extent that a person could, given the actions of the mother.” In reaching that conclusion, the juvenile court found that C.C. provided financial support through the time period he believed the child alive and assisted J.T. with her other children while she was pregnant, and that if he had not been thwarted by the deception of J.T., he would have made a more substantial contribution. The juvenile court further stated that “given the litany of deceitful maneuvers on the part of [J.T.], [C.C.] was clearly thwarted in his attempt to contribute more to his child.”
The juvenile court noted that J.T. never had any doubt that C.C. was the father of baby G.T. Further, the mother informed all parties that her husband was not the father and nonetheless, neither the adoptive parents nor their attorney attempted to discover the identity of the father. Considering the totality of the circumstances, the juvenile court was not convinced that the adoptive parents’ attorney could not have ascertained the identity of the biological father.
^Regarding surrenders of children for adoption, commentators have pointed out that:
In counseling a parent who intends to surrender a child for adoption caseworkers and counsel must emphasize the importance of candor and accuracy in giving information. Misrepresentations or negligent misstatements can set in motion a host of unnecessary and horrific problems.
[[Image here]]
It is better to have an adoption fail early due to a successful opposition by an alleged father ... than to fail later, disrupting the long-settled expectation of all parties and the stability of the child.
Lucy S. McGough & Kerry Triche, Louisiana Children’s Code Handbook, 620, 2014 (Authors’ Notes to La. Ch. Code art. 1122). In this case, regrettably it appears that proper counsel on surrender did not happen and thus, the “horrific problems” predicted by the commentators have resulted. G.T., who is almost two, is deeply bonded with his prospective adoptive parents, and it appears that they have provided him with a loving and nurturing home. Additionally, C.C., through no fault of his own, has been unable to meet and establish a relationship with his biological child. C.C.’s testimony portrayed a father committed to the responsibilities of parenthood. He never wanted to place the baby for adoption, he was looking forward to the baby’s birth, and was heartbroken when he was told that J.T. had a miscarriage. C.C. discovered the baby’s birth in January 2014, when G.T. was four months old. Only a few weeks later, on February 11, 2014, C.C. executed an “Acknowledgement of Paternity” affidavit and, on February 19, 2014, he registered with the putative father registry. C.C. testified that he was unsure what to do after taking that step, and thought that he would be contacted when it was time to finalize the adoption. When nothing happened, he began to get worried and started looking for a lawyer. He spoke with an attorney in May 2014, who was not helpful. He then hired a lawyer in July 2014, who quickly filed an intervention on his behalf in August 2014, when G.T. was eleven months old. Further, after learning that G.T. was alive, C.C. | ^obtained employment to ensure that *111 G.T. could receive medical insurance. C.C. also has a room for G.T. where he is living.
The record reflects that A.S. and M.S. contacted C.C. in January 2014, through text messages and phone calls. C.C. admitted that he did not respond to the messages, but stated that he did not return their calls because he was concerned about speaking to them before he hired an attorney. C.C. testified that he “didn’t want to say the wrong thing” to A.S. and M.S.
Although the juvenile court did not directly distinguish the actions of C.C. before and after he found out about the birth of G.T., we find C.C.’s well-explained delay in legally asserting his rights cannot negate his constitutionally protected interest in his opportunity to develop a “mutually beneficial ... emotional bond with his child.” In re Adoption of B.G.S., 556 So.2d at 550.
While this is an extraordinarily difficult situation, created by the dishonest actions of G.T.’s birthmother, we simply cannot find error in the juvenile court’s conclusion that C.C. met his burden of proof under La. Ch. Code art. 1138. Thus, the adoption of G.T. cannot take place without C.C.’s consent.
CONCLUSION
For the foregoing reasons, we affirm the judgment of the juvenile court ordering that the adoption of G.T. cannot take place without the consent of C.C. and ordering that G.T. is not certified for placement for adoption. All costs of this appeal are to be assessed against A.S. and M.S.
AFFIRMED.