776 So.2d 567 (2000)
In re ADOPTION OF A.P.C. and R.P.C.
No. 00-CA-1381.
Court of Appeal of Louisiana, Fifth Circuit.
December 13, 2000.
Rehearing Denied January 18, 2001.
Writ Denied February 14, 2001.
*569 Craig E. Gibbs, New Orleans, LA, Counsel for Paul Buras, Mover-Appellant.
Howard B. Kaplan, Bernard, Cassisa, Elliott & Davis, Metairie, LA, Counsel for Acorn Adoption, Inc., Opponent-on-Motion/Appellee.
Panel composed of Judges DUFRESNE, CHEHARDY, and ROTHSCHILD, J. Pro Tempore.
CHEHARDY, Judge.
This appeal arises in a proceeding to adopt twin male children. The children's biological father seeks review of a judgment that terminated his parental rights. We affirm.
*570 The children, A.P.C. and R.C.C., were born on July 31, 1999 to S.E.C., a single woman.[1] No father was named on the birth certificate. On February 23, 2000 S.E.C. executed voluntary acts of surrender of the children. Pursuant to La.Ch.C. art. 1132 the alleged father, P.C.B., was notified of the surrender on March 14, 2000. On March 30, 2000 P.C.B. filed a timely motion in opposition to the adoption, pursuant to La.Ch.C. art. 1137.
After an evidentiary hearing, the juvenile court found that P.C.B. failed to prove that he had made a substantial commitment to his parental responsibilities and that he is a fit parent. Accordingly, the court terminated his parental rights and declared the children available for adoption.
P.C.B. appeals, contending the juvenile court committed manifest error and was clearly erroneous in terminating his parental rights and obligations under Louisiana Children's Code Article 1138. He asserts that not only did he acknowledge his paternity of the children at the hearing, but also he proved by a preponderance of the evidence his fitness as a parent, his substantial commitment to his parental responsibilities, and his willingness and ability to assume legal and physical care of the children. P.C.B. seeks reversal of the juvenile court's ruling and an order granting him physical and legal custody of the children.
La.Ch.C. Art. 1138 provides for hearing and determination of any opposition to adoption and establishment of parental rights, as follows:
A. At the hearing of the opposition, the alleged or adjudicated father must establish his parental rights by acknowledging that he is the father of the child and by proving that he has manifested a substantial commitment to his parental responsibilities and that he is a fit parent of his child.
B. Proof of the father's substantial commitment to his parental responsibilities requires a showing, in accordance with his means and knowledge of the mother's pregnancy or the child's birth, that he either:
(1) Provided financial support, including but not limited to the payment of consistent support to the mother during her pregnancy, contributions to the payment of the medical expenses of pregnancy and birth, or contributions of consistent support of the child after birth; that he frequently and consistently visited the child after birth; and that he is now willing and able to assume legal and physical care of the child.
(2) Was willing to provide such support and to visit the child and that he made reasonable attempts to manifest such a parental commitment, but was thwarted in his efforts by the mother or her agents, and that he is now willing and able to assume legal and physical care of the child.
C. The child and the legal custodian may offer rebuttal evidence limited to the issues enumerated in Paragraphs A and B of this Article.
D. If the court finds that the alleged or adjudicated father has failed to establish his parental rights, it shall decree that his rights are terminated.
E. If the court finds that the alleged or adjudicated father has established his parental rights, the court shall declare that no adoption may be granted without his consent and shall order the child to be in his legal custody. The court may also order the alleged or adjudicated father to reimburse the department, or the licensed private adoption agency, or other agency, or whoever has assumed liability for such costs, all or part of the medical expenses incurred for the mother and the child in connection with the birth of the child.
*571 The comments following Article 1138 note, in pertinent part, that the article is "consistent with requirements declared by the Supreme Court" and also that the criteria for assessing the father's rights are derived from In re Adoption of B.G.S., 556 So.2d 545 (1990). La. Ch.C. Art. 1138, Comments-1991, (a) and (b).
The juvenile court rendered lengthy and detailed written reasons for judgment, discussing each of the factors listed in La. Ch.C. Art. 1138(A)-(B) and making factual findings regarding each. Those reasons are so clearly framed that we can hardly improve upon them. Accordingly, rather than repeat the juvenile court's discussion of the law and findings of fact, we adopt them as part of our opinion (in edited form) and incorporate them by appending them following our ruling. (See APPENDIX.) In the body of this opinion we discuss only the legal issues relevant to the appeal.
On appeal P.C.B. addresses each of the Article 1138 criteria.

Acknowledgment of Paternity
As P.C.B. notes, the juvenile court ruled he satisfied this requirement.

Substantial Commitment to Parental Responsibilities
Appellant challenges the court's determination that he did not demonstrate a substantial commitment to his parental responsibilities. The juvenile court based that portion of the ruling on its findings that P.C.B. failed to pay any of the medical expenses of the pregnancy and birth and failed to provide consistent support after the birth of the children.
P.C.B. asserts that he lived with S.E.C. during her pregnancy and afterwards until the children were taken from his home; he paid the rent and utilities of the family home; he provided food for S.E.C. and her older child (from another relationship), and that he gave S.E.C. money for additional items needed for the children and the household. He asserts the reason he did not buy food for the twins or provide medical coverage for them or their mother was because S.E.C. received public assistance for food and medical care.
P.C.B. acknowledges that S.E.C. was eligible for the public assistance because he was not married to her and he was not listed on the twins' birth certificates as their father. He admits he was in the delivery room when the twins were born yet did not place his name on their birth certificates, but states that S.E.C. made the decision not to list him in order to obtain benefits. He contends that S.E.C. chose to receive government assistance for baby food and medical care, so that she could use money given her by appellant for weekend road trips and drugs.
As for the testimony regarding problems with utilities in the home and its lack of cleanliness, he asserts that S.E.C.'s parents (the babies' maternal grandparents), on whose testimony the court based its findings, were estranged from S.E.C. and P.C.B. and rarely came to the home. He also points out that no one considered the home bad enough either to offer to take the children away or to complain to social services. He also cites the testimony of S.E.C.'s mother that the night before the children were surrendered to the adoption agency they were "beautiful."
As to the conditions in the home and the problems with utilities, P.C.B. reiterates the explanations that were found insufficient by the trial court. He also asserts that the law does not require a father to be completely responsible for all care and support of his children. Finally, he points to the uncontradicted testimony of his witnesses (his sister and a neighbor) that he parented the twins by feeding them, bathing them, and changing their diapers, as well as staying with them while the mother left for entire weekends.

Parent Willing and Able to Assume Legal and Physical Care of the Children
P.C.B. contests the juvenile court's finding that he did not present adequate provisions for care of the children while he is at *572 work. He works an afternoon-evening shift, from 3:00 p.m. to 11:00 p.m. There was testimony that a neighbor would watch the children from 3:00 until 5:00 or 6:00, after which P.C.B.'s sister would take over until 11:00 p.m. P.C.B. also relied on testimony regarding the likelihood that his current temporary job would become permanent employment in a few months. He contests further the court's finding that he is violent and not sufficiently mature and responsible to care for the children.

Fit Parent
La. Ch.C. art. 1103(5) defines parental fitness for purposes of surrender of parental rights as follows:
(a) That a parent has not abused the child. For purposes of this Subparagraph, abuse means the infliction of physical or mental injury which causes deterioration to the child, sexual abuse, exploitation, or overworking of a child to such an extent that his health or moral or emotional well-being is endangered.
(b) That a parent has consistently offered to provide reasonably necessary food, clothing, appropriate shelter, or treatment for the child. For purposes of this Subparagraph, treatment means medical care or other health services provided in accordance with the tenets of a wellrecognized religious method of healing with a reasonable, proven record of success.
(c) That a parent suffers from no medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, substance abuse, or chemical dependency which makes him unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.
(d) Viewed in its entirety, the parent's past or present conduct, including his criminal convictions, would not pose a risk of substantial harm to the physical, mental, or emotional health of the child.
Appellant contests the juvenile court's findings that his provision of food, clothing, shelter and treatment of the children was inadequate. He points out there have been no allegations of child abuse against him. He reiterates that he paid the rent and utilities for the home in which he and S.E.C. lived with the children. He admits that he did not buy baby food for the twins or carry them on his medical insurance, but asserts that because S.E.C. was receiving public assistance for food (WIC) and medical care (Medicaid) there was no need for him to provide those items. He also states that he provided S.E.C. and her older child with food and gave her money for additional items needed for the children and the household.
P.C.B. contests the juvenile court's focus on his consumption of alcohol. He acknowledges his three DWI convictions, and admitted them during the hearing, he asserts that "[f]or this reason, [he] only drinks on weekends and does not drink and drive." He also points to the testimony of his witnesses that his beer-drinking did not affect his care of the children and to the admissions of S.E.C. that he did not drink when he was left alone to care for his children when she left on weekends. S.E.C.an admittedly hostile witness claimed she knew he did not drink because he sounded sober when she telephoned him while she was away.
P.C.B. also disputes the juvenile court's focus on his conviction for marijuana possession and his arrest for a domestic dispute with S.E.C. He asserts that these were problems arising from his relationship with S.E.C., but that relationship is over. He contends his past criminal history does not establish that he would pose a risk to the children and that any emotional abuse in his relationship with S.E.C. that might affect the children no longer exists because S.E.C. will no longer be a part of his household.

Credibility of Witnesses
P.C.B. contends the juvenile court was clearly wrong in relying heavily on the *573 testimony of S.E.C. and her parents, all of whom he claims are hostile to him because he refused to marry S.E.C. An additional factor affecting S.E.C.'s testimony, he claims, is that she "had a financial interest" in the adoption because the adoption agency provided her with money and psychiatric care and promised her assistance in finding shelter, work and education. He also states that S.E.C. is an admitted drug user. He points to the testimony of his witnesses that he supported and fathered his children and contends that "manifest and clear error occur when the court ignores the testimony of seven credible witnesses."

Standard of Review
It is well-settled that an appellate court cannot set aside a juvenile court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. "Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the trial court." ... Where the fact finder is presented with two permissible views of the evidence, the fact finder's choice between them is not clearly wrong. [Citations omitted.]
In re A.J.F., 00-0948, p. 25 (La.6/30/00), 764 So.2d 47, 61.
In manifest error review, it is important that the appellate court not substitute its opinion when it is the juvenile court who is in the unique position to see and hear the witnesses as they testify. The trier of fact is not disadvantaged by the review of a cold record and is in a superior position to observe the nuances of demeanor evidence not revealed in a record.
In re A.J.F., 00-0948 at p. 26, 764 So.2d at 62.
The two-part test for appellate review of a fact-finder's determination requires that the appellate court must find from the record that there is a reasonable factual basis for the finding of the trial court; second, the appellate court must further determine that the record establishes that the finding is not clearly wrong (manifestly erroneous). Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
The juvenile court's findings on all these points turned on determinations of credibility of the witnesses, which we cannot overturn unless clearly wrong. Our review of the entire transcript reveals a reasonable factual basis for the determinations and shows no manifest error in the trial court's findings.

Instanter Order
Alternatively, P.C.B. contends that after finding him an unfit parent, rather than terminating his parental rights the juvenile court should have issued an instanter order, pursuant to La. Ch.C. art. 619, to place custody in the state pending further action. He contends issuance of such an order and handling of the case as a child in need of care proceeding would prevent his losing his rights to the children.
Appellant derives this assignment from the "Comments 1991" following La. Ch.C. Art. 1138. Comment (c) states:
Paragraph B clarifies In re B.G.S., supra, by expressly recognizing that if the father's parental rights are found to have been established, no adoption may be ordered without his consent.... Furthermore, as the child's biological parent with an "established relationship," he is presumptively entitled to his child's legal custody.... In the extreme case in which a father proved an established relationship but was found from the evidence to be unfit, the court could issue an instanter order pursuant to Article 619.[2]
*574 That suggestion is not applicable here, however, because the trial court has found that appellant failed to establish his parental rights. As our supreme court stated in In the Matter of R.E., 94-2657 (La.11/9/94), 645 So.2d 205, 207:
[T]he statutes [Ch.C. Arts. 1137-1138] contemplate that the unwed father's constitutionally protected interest in a parent-child relationship does not come into existence until the father demonstrates his fitness for parental responsibilities, commitment to those responsibilities, concrete actions taken to grasp his opportunity to be a father, and the potential for him to make a valuable contribution to the child's development.
Accordingly, we find no merit to the assignments of error by the appellant.

DECREE
For the foregoing reasons, the judgment of the juvenile court is affirmed. The parties are assessed their own costs for this appeal.
AFFIRMED.

APPENDIX TO NO. 00-CA-1381, IN RE: ADOPTION OF A.P.C. AND R.P.C.

JUVENILE COURT FOR THE PARISH OF JEFFERSON STATE OF LOUISIANA

* * *

REASONS FOR JUDGMENT

Procedural Posture
SEC executed a Voluntary Act of Surrender of her twins, APC and RCC, on February 23, 2000 and it was filed for record on February 24, 2000. In accordance with Ch. C. Art. 1132, the alleged father of the children, PCB, was given notice of the filing of the surrender. The notice was issued on March 14, 2000 and as evidenced by the return receipt, was received by PCB on March 16, 2000. On March 30, 2000, PCB filed a timely notice of opposition to the adoption.

* * *

Facts
SEC and PCB began a turbulent relationship in 1998 and by October of that year, SEC was pregnant with the twins who are the subject of this proceeding. During their three-year live-in relationships, there was much violence, which both parties admitted to instigating. SEC testified that most of PCB's violent behavior was precipitated by his excessive drinking. Over the last fifteen years, PCB admitted to being arrested and convicted of driving while intoxicated on three occasions, and having been arrested for being in possession of marijuana. He stated that he was court ordered to receive counseling for his drinking but was not at this time participating in Alcoholics' Anonymous.
The twins were born on July 31, 1999 and when they came home from the hospital, they lived with SEC and PCB until February 23, 2000 at which time they were surrendered for adoption by their mother. The parents of these children discussed the possibility of adoption and PCB agreed but wanted the children to be adopted by a friend of his mother. He nonetheless agreed to talk to a representative of Acorn Adoption Agency and indicated that he would be willing to execute a surrender. On February 22, 2000, a representative of Acorn came to PCB's home for execution of the documents. At that time, PCB agreed to sign but asked for two additional days so he might have time to say good-bye to the babies. Acorn agreed and made arrangements to return on February 24, 2000. The next day, SEC contacted Acorn and said that she wanted to surrender *575 the children for adoption. Acorn returned to the home on February 23, 2000, had SEC sign the surrender and accepted the children for adoptive placement.

Legal Analysis
Ch.C. Art. 1110 entitled "Nature of authority" states as follows:
The surrender of a child for adoption by one parent shall have no effect upon the parental rights of any other parent.
Prior to the enactment of Ch. C. Art. 1110, fathers of illegitimate children who failed to have their name placed on his child's birth certificate was accorded no parental rights. This article protects the constitutional rights of fathers of illegitimate children in accordance with In Re: BGS 556 So.2d 545 (La.1990) wherein the Louisiana Supreme Court held that such fathers had a right to notice and an opportunity to be heard.
When a mother surrenders her parental rights, the law requires that an alleged or adjudicated father be given notice of the filing of surrender. Ch. C. Art. 1137 entitled "Notice of opposition to adoption by alleged or adjudicated father; time limitations; appointment of counsel for the child; scheduling of hearing; paternity testing" provides in pertinent part as follows:[1]
A. An alleged or adjudicated father... may oppose the adoption of his child by filing a clear and written declaration of intention to oppose the adoption. The notice of opposition shall be filed with the court indicated in the notice of filing of surrender within fifteen days after the time he was served with the notice of surrender, or from the time he was served with notice of the filing of an adoption petition in the event that no surrender was executed or filed.
Through the hearing of opposition, the father's due process rights are guaranteed. These rights are met by his receiving notice of the hearing and being given the opportunity to prove his commitment to his parental responsibilities and his fitness as a parent. In the Matter of R.E., 645 So.2d 205, 208 (La.1994) citing to Lehr v. Robinson 463 U.S. 248, 250, 261, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983).
Ch. C. Art. 1138 entitled "Hearing of opposition to adoption; establishment of parental rights" provides the criteria which the father must meet in order to successfully oppose the adoption and states as follows: [Text quoted.]
Pursuant to Ch. C. Art. 1138, at the hearing of opposition the burden is placed on the alleged or adjudicated father. In order to successfully oppose the adoption, he must meet all of the following criteria:
1) acknowledge that he is the father of the child, thereby establishing his parental rights, and
2) prove that he has manifested a substantial commitment to his parental responsibilities, and
3) prove that he is fit to parent the child.
Acknowledgment of the child for purposes of this criteria means acknowledgment in open court and is different from a formal acknowledgment. See McGough and Triche, 1998 Author's Notes on Article 1138, West's Children's Code Handbook, 1998 version, page 492. It is significant to note, however, that the case law provides that formal acknowledgment of a child is a factor, which proves substantial commitment to parental responsibilities.
Proof that the father has manifested a substantial commitment to parental responsibilities requires a showing that he meets one of the following:
(1) Provided financial support, including but not limited to the payment of consistent support to the mother during *576 her pregnancy, contributions to the payment of the medical expenses of pregnancy and birth, or contributions of consistent support of the child after birth; that he frequently and consistently visited the child after birth; and that he is now willing and able to assume legal and physical care of the child.
(2) Was willing to provide such support and to visit the child and that he made reasonable attempts to manifest such parental commitment, but was thwarted in his efforts by the mother or her agents, and that he is now willing and able to assume legal and physical care of the child.
In making the decision whether to grant or deny the opposition, the statute specifies that the court must take into consideration the means of the father and his knowledge of the mother's pregnancy or the child's birth. Proof of the parental commitment should include not only the commitment the father had prior to the hearing but also his willingness and ability to parent the child following the hearing. McGough and Triche, 1998 Author's Notes on Article 1138, West's Children's Code Handbook, 1998 version, page 493. This evidence is necessary due to the fact that the statute mandates the court to place the child in the custody of the father in the event that the opposition is granted.
Parental fitness is defined in Ch. C. Art. 1103(5) entitled "Definitions" and which states as follows: [Text quoted.]

Preservation of the Father's Parental Rights When Mother Surrenders
At the hearing on the opposition to this motion, Dr. Scott Butler, representing ACORN Adoption Agency, testified. On cross examination, Attorney Gibbs, counsel for PCB, raised the question of whether it was legal for the adoption agency to accept the mother's surrender and take the children without a signed surrender by the father. This was significant given the unusual circumstances that the children were living with the father at the time that the mother signed the surrender. The Court took this issue under advisement and ordered that the attorneys submit memoranda on this issue.
Prior to the enactment of the Louisiana Children's Code which became effective in January 1992, under the Code of Juvenile Procedure, a father of an illegitimate child who failed to place his name on the birth certificate had no standing to oppose the surrender of a child for adoption. Furthermore, the mother was required to consent to the father's name being placed on the birth certificate. If the father opposed the adoption, his only recourse was to prove that the adoption was not in the child's best interest.
In In Re: BGS, supra, a father of an illegitimate child challenged the constitutionality of that law. The Supreme Court held the law to be unconstitutional and afforded certain limited rights to fathers of illegitimate children. The father of an illegitimate child is entitled to notice of the filing of a mother's surrender and an opportunity to be heard.
This differs from the rights of a parent who qualifies as a legal father pursuant to Ch. C. Art. 1193. A father who qualifies under Ch. C. Art. 1193 must consent to an adoption if his rights have not been terminated.
In the instant case, PCB was not a legal father within the context of Ch. C. Art. 1193. Therefore, he is entitled to notice that a surrender was filed. Then in accordance with Ch. C. Art. 1137, he has fifteen days to notify the Court of his intention to oppose the adoption. Accordingly, the Court must give the father the opportunity to be heard. PCB was notified in accordance with the law, timely *577 objected and was given a hearing date on April 10, 2000. At the request of his attorney, the hearing was continued until May 3, 2000. At that hearing, the alleged father is given the opportunity and the burden of proof is on him to show that he has made a substantial commitment to his parental responsibilities, that he acknowledges the children and that he is a fit parent for the children. If he can carry this burden of proof, he then becomes a father whose consent must be given under Ch. C. Art. 1193(4).
The facts surrounding this particular situation are somewhat different from the norm. In this case, the mother and father of the babies lived together throughout the mother's pregnancy and almost seven months subsequent to the birth of the babies. While it is a less frequent occasion that babies are surrendered for adoption under these circumstances, the law which applies to fathers of illegitimate children nonetheless applies.
Unlike fathers whose babies are surrendered at the age of five days, PCB had ample opportunity to take measures to ensure his parental rights, yet he did nothing. It is ludicrous to argue that just because the babies lived with him for seven months that the right to withhold his consent to this adoption has somehow accrued.
During their two-year relationship, PCB could have married SEC. This would have guaranteed his right to consent to the adoption. However, he did not marry SEC. According to the testimony, which was undisputed, he proposed marriage to SEC and at the engagement party given at PCB's parents' home, he told SEC's father that he changed his mind about the marriage. According to PCB's testimony, he just was not ready for marriage.
PCB could have executed a legitimation by authentic act pursuant to La. C.C. Art. 200, which would have protected his right to consent to this adoption, but he failed to do that. As a matter of fact, PCB did not even have his name placed on these babies' birth certificates. According to the testimony, there was a concern that should he place his name on the birth certificates, the Medicaid and WIC benefits would be negatively affected. It is disputed as to whether SEC was concerned about her welfare benefits or whether it was PCB. It makes little difference to this Court, however, as to whose idea it was to omit his name from the birth certificates, as PCB at the very least acquiesced in the decision.
Since PCB was not a father as described in Ch. C. Art. 1193, he is not a father whose consent to an adoption is required. He is merely entitled to notice that a surrender was filed and an opportunity to be heard. His constitutional due process rights have been preserved and Acorn Adoption Agency followed the correct procedure by having the mother properly execute her surrender and placing the babies for adoption.
At the opposition hearing, the burden is on the opposing father to prove by a preponderance of the evidence that he has manifested a substantial interest to his parental responsibilities and that he is fit to parent the child. Matter of R.E. 645 So.2d 205 (La.1994).
The first requirement of Ch. C. Art. 1138 is that the alleged father must "establish his parental rights by acknowledging that he is the father of the child...." This requirement is met when the father makes a declaration of paternity in open court. This is different from the Civil Code requirements of acknowledgement, which mandates an authentic act.
*578 In the instant matter, PCB admitted in open court that he is the father of the babies surrendered for adoption. He did not put his paternity at issue and no blood tests were ordered. As a result of PCB's acknowledgement of paternity in open court, he meets the first part of the test and no further discussion on that point is necessary.
The next criteria under Ch. C. Art. 1138(A) is that the father must prove that he has "manifested a substantial commitment to his parental responsibilities." Paragraph (B) of Article 1138 sets forth in detail what must be shown to prove a substantial commitment to parental responsibilities. He must show that he "provided financial support, including but not limited to the payment of medical expenses of the pregnancy and birth, or contributions of consistent support after the birth." Pursuant to Ch. C. Art. 1138(B)(2), if the support was not provided, he must show that he was "willing to provide such support .... that he made reasonable attempts to manifest such parental commitment, but was thwarted inhis efforts by the mother or her agents...."
In the case at bar, there were no allegations that the mother thwarted PCB's efforts to establish his commitment to his parental responsibilities. As a matter of undisputed fact, the children were living with the father until the date of their surrender by SEC. Therefore, PCB must prove that he manifested a commitment to his parental responsibilities by providing financial support including but not limited to payment of medical expenses of the pregnancy and birth or contribution of support after the birth.
This Court finds that even considering the fact that the children lived with him under his roof for seven months after their birth, PCB failed to meet his burden by a preponderance of the evidence that he established his substantial commitment to his parental responsibilities for the following reasons.

PCB failed to pay any of the medical expenses of the pregnancy and birth
SEC testified that her medical expenses were paid by Medicaid. This testimony was corroborated by PCB. Although there was evidence to show that PCB lost one or more jobs due to his irresponsibility, the testimony showed that he always found other employment rather quickly. By his own testimony, PCB was employed throughout most of SEC's pregnancy and during the seven months that the babies lived with him and that he earned approximately $1,400.00 to $1,600.00 per month. Additionally, PCB admitted to having a 401k retirement plan containing at least $15,000.00. He further admitted that he received a tax refund of $2,000.00. None of this money went to the medical expenses of SEC or the babies she bore him. Instead he chose to allow the children and their mother to remain on Medicaid and to allow the State of Louisiana to assume the financial burden of his responsibilities.
Additionally, after the babies were born, a decision was made to exclude PCB's name from the birth certificates because it would have affected SEC's Medicaid benefits. PCB stated that it was SEC's idea to omit his name from the birth certificates. SEC testified that it was PCB's idea. It is of little consequence who suggested leaving PCB's name from the birth certificate, as it is very clear that the purpose of doing so was to maintain benefits from the State. It is also clear that PCB agreed. If he truly wanted to acknowledge himself as the father of these children, he could have had his name put on the birth certificates and insisted upon assuming the financial responsibility for his children. Additionally, *579 the Court notes that while employed with Brice Corporation, PCB had medical insurance benefits. He testified that he "never asked" if the babies could be put on this policy, evidencing absolutely no intent in supporting the medical needs of these children.

PCB failed to provide consistent support after the hirth of the children
This Court takes note of the fact that the children lived under PCB's roof for seven months following their birth. During that time, he paid the rent and therefore provided shelter for the children and their mother. Other than shelter, PCB did not provide much else for the care and support of his children. This Court also considers it noteworthy that PCB did not obtain a larger apartment that would be more accommodating and perhaps cost more in order to support his children. As a matter of fact, SEC's parents offered SEC and her children shelter and SEC moved in with her parents at one point during her chaotic relationship with PCB. PCB remained in the same apartment at the same cost as when the babies were living with him. Since the babies were surrendered for adoption, PCB still lives in the same housing as he did when SEC and the children lived with him.
Furthermore, there was much testimony to indicate that the shelter he provided was inadequate. SEC testified that she had to go to the neighbor's apartment to use the bathroom because the plumbing facilities in her apartment were broken. She testified that for long periods of time, the heat was turned off for nonpayment of the gas bill. SEC testified that as the weather got cold, PCB failed to have the heat turned on and it was difficult to keep the babies warm. PCB testified that he had the gas turned off during the summer because only the heater was gas and not needed during the summer months.
SEC further testified that during much of her pregnancy, the telephone was turned off. PCB confirmed this and [implied] that it did not matter because the neighbors had a telephone she could use in case of an emergency. Also, there were times when the electricity was turned off.
SEC's mother and father both testified at the hearing. SEC's father stated that the conditions in the apartment were appalling. There was filth and trash and the place was not fit for babies. SEC's mother testified that the conditions in the apartment were deplorable. There was trash, clothes and dishes all over. Just a few weeks before the twins were due, SEC and PCB had no provisions for the babies. SEC's mother purchased a layette, changing table and clothes for the babies. PCB provided nothing to meet the needs of the children.
PCB testified that he took the babies to the doctor one time during the seven months that they lived with him. He did not even know the name of their pediatrician.
PCB testified that he fed the babies, changed their diapers and put them to sleep and these activities constitute a substantial commitment to his parental responsibilities. While these things are important, it takes more than this to support a finding of substantial commitment. Furthermore, there was contradictory testimony, which the Court considered. SEC testified that while PCB would help with these duties, she said that it was difficult to get his cooperation. She testified that she resorted to leaving on the weekends in order to get away from her responsibility on occasion and this was her way of forcing PCB to take responsibility for his children. While this Court considers SEC's actions in leaving the children with PCB *580 irresponsible, it demonstrates her frustration over PCB's lack of commitment to these children.

PCB's agreement to the adoption subject to certain conditions demonstrates a lack of commitment to his parental responsibilities
PCB spoke to Dr. Scott Butler, the executive director of Acorn Adoption Agency. He agreed to surrender the children for adoption. Dr. Butler came to PCB's home on February 22, 2000 for the express purpose of having SEC and PCB sign surrenders of their parental rights. At that time, PCB asked that Dr. Butler return on February 24, 2000, only because he wanted time to say good bye to the twins and not because he changed his mind about the decision to surrender his parental rights.
PCB testified that he was in agreement with SEC that adoption would be in the best interest of these children. At no time did he indicate to SEC that he changed his mind about surrendering the children for adoption. He did indicate to SEC that he preferred surrendering the children to a friend of his mother. This would ensure that he could visit with the children. This is an indication to the Court that PCB was interested in preserving his rights as a parent without the necessity of assuming the responsibilities of parenthood.

PCB failed to take substantial steps to maintain his commitment to parental responsibilities as enumerated in In Re: BGS
In In Re Adoption of BGS supra, the court enumerated the efforts of an unwed father to demonstrate his commitment to parental responsibilities. In that case, the father accompanied the mother to the hospital and stayed with her throughout labor. He formally acknowledged the child, registered with the Putative Father Registry and attempted to have his name placed on the child's birth certificate. Additionally, he sought custody of the child through habeas corpus proceedings shortly after the birth.
While PCB did accompany the mother to the hospital when she went into labor, he made no other efforts enumerated in BGS. He testified that he formally acknowledged the children about two weeks prior to the hearing, however, there is no copy of such acknowledgement in the record nor is there any record in the clerk's office of Jefferson Parish. PCB did not register with the Putative Father Registry. He did not have his name placed'on the birth certificates. As a matter of fact, as previously discussed, he avoided formal acknowledgment in order to preserve SEC's welfare rights. Although he filed a timely opposition to the adoption, he has never sought custody of the children through habeas corpus proceedings.
Additionally, this Court considers important the fact that PCB had several months after the birth of the twins to demonstrate these efforts. In BGS and in most other cases, the child is surrendered for adoption when he or she is only a few days old and the father is afforded much less time to demonstrate a commitment to his parental responsibilities.
The father must also prove under Ch. C. Art. 1138 is that he is now willing and able to assume the legal and physical care of the child.
This Court believes that while PCB may have demonstrated a willingness to assume the physical and legal custody of these children, he has failed to prove that he is able to do so. As previously discussed, SEC's parents both testified and it is important to note that of all the witnesses who testified at this hearing, they were the most credible. They said that PCB's home was in deplorable condition. They described an apartment that was filthy and *581 riddled with trash and dirty dishes. They stated that the home was not fit for children.
They testified that on many occasions, the utilities were disconnected. During one period of time, the plumbing was broken and they had to use the neighbor's facilities. It is unclear as to how long this condition persisted, but SEC indicated that the length of time was significant. PCB fails to pay his utility bills and there have been periods where they lived in the apartment with no telephone, no electricity and no heat. It is obvious to this Court that PCB is unable to provide an adequate home for these babies.
Furthermore, PCB has failed to show this Court that he has adequate provisions for the care of these children while he is at work. He presently works the evening shift at Tull Metals. He stated that he is working for that company through a temporary agency at this time, however, he plans to be hired as a full time employee of Tull Metals in the near future. He presently works the evening shift from 3:00 p.m. until 11:00 p.m. daily and this will continue upon his being hired by Tull. These working hours make it difficult to find someone to care for the children. PCB testified that his sister would take care of the babies while he is at work.
This arrangement is not plausible for several reasons. First, PCB's sister plans to live in St. Rose in the near future and PCB lives in Kenner. She has a full time job and she gets off of work at 5:00 p.m. She has a family of her own to take care of and yet she testified that it would not be a problem to work all day and then drive to Kenner to care for PCB's twins well into the night.
In considering PCB's ability to assume the physical and legal custody of these children, this Court cannot ignore the testimony regarding outrageous domestic violence that occurred during the course of his relationship with SEC. There is no doubt that PCB is a violent person. There was testimony that PCB was often drunk, that on one occasion he punched out a window, and on many occasions he beat his girlfriend to the extent that she sustained cuts and bruises. This is not the behavior of a man mature enough and responsible enough to take on the care and custody of two infants. This Court takes note of the fact that SEC participated in and contributed to the violence that occurred in this home as she admitted to that herself. Further, there is not much doubt that SEC is not able to assume the responsibilities of parenthood, however, her parenting abilities are not at issue here. The only person that matters in making this analysis is PCB and it is quite clear that his drinking which precipitates the violent behavior makes PCB unable to assume the legal and physical custody of these children. These issues will be discussed in greater detail pursuant to the issue of his fitness as a parent to these children.
Finally, the father must prove that he is a fit parent of his child.
In order for the father to meet his burden, he must prove his fitness by meeting the criteria listed in Ch. C. Art. 1103(5). Under Ch. C. Art. 103(5)(a), parental fitness means that the parent has not abused the child. In many instances, the child is given up for adoption before the father has had any opportunity to interact with the child. In this case, the children lived with PCB for almost seven months. There was no testimony to indicate that the children were physically or mentally abused such that it caused deterioration to the children, nor was there any evidence of sexual abuse. The degree of domestic violence in the home prior to the surrender is significant, however, and cannot be ignored by this Court in its determination *582 of the fitness of PCB to parent his children.
On one occasion, during SEC's pregnancy with the twins, PCB came home drunk. He testified that he had a few beers but was not drunk. The door was locked, he thought SEC was not home, so he punched the window and cut his hand, SEC then punched the window and cut her hand. They both went to the hospital. The doctor who treated PCB did not believe his story and he called the police. Both PCB and SEC were arrested for disturbing the peace.
SEC testified that the police were called to her house on many occasions, the stereo was too loud and the neighbors complained or PCB was passed out in the bushes. SEC testified that the relationship was very violent. Both SEC and PCB were aggressive to each other. She testified that she bashed all of his bottles of beer in the back yard. She stated that on many occasions, PCB hit her causing cuts and bruises. More than once he tried to strangle her leaving bruises on her neck.
While the violence was not perpetrated directly on the babies, there is no doubt that this was an abusive situation for these children and if nothing else, this lifestyle that PCB lives will ultimately have a negative effect on these children, were he to receive custody of them. In the opinion of this Court, subjecting these children to this behavior, coupled with PCB's alcohol abuse, would be tantamount to emotional abuse at the very least.
The second part of the fitness test under Ch. C. Art. 1103(5)(b) is that the parent consistently provided necessary food, clothing, shelter or treatment for the child.
The provisions made by PCB for the benefit of the children was discussed previously in detail. This Court takes note of the fact that PCB did not provide food or clothing for the benefit of the babies. By his own admission, the babies' food was provided by WIC. As per SEC's testimony as well as the testimony of her parents, they provided clothing and other necessities for the babies. PCB did provide shelter for the children by allowing them to move in with him.
Finally, the third part of the fitness standard is that he suffers from no medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, substance abuse, or chemical dependency which makes him unwilling or unable to provide for the child.
PCB testified that he has been convicted of Driving while Intoxicated on three occasions. The first time was when he was twenty years old, the second was when he was twenty-eight years old and the third time was two years ago at the age of thirty-three years old. He stated that after the third DWI conviction, he was ordered into treatment and he completed the program. He stated that he does not have an alcohol problem and he is not participating in any program such as Alcoholics Anonymous at this time. He also testified that he drinks on the weekends, up to a twelve pack a weekend. He testified that he had not driven while drunk since his last DWI conviction. He did state, however, that on the evening of the incident previously discussed, when he punched the window and was arrested for disturbing the peace, he had been drinking and driving. He testified that he does on occasion drink until he is drunk and has done so as recently as the week before the hearing. He further stated that he has been drunk while with the children and he did not see that as a problem since the children were either sleeping or SEC was home.
PCB's friend, described by SEC as PCB's "drinking buddy", testified on PCB's behalf. His friend denies being PCB's "drinking buddy" although they do *583 drink together. He stated that PCB drinks about a case of beer in a weekend. When the reaction by the attorney was one of surprise, he changed his testimony to say that PCB drank only 12 beers per weekend. He also stated that PCB drinks when he is depressed. The friend has had two DWI convictions.
SEC testified saying that on many occasions PCB drank and drove. She also testified that he would pass out drunk in the front yard.
This testimony indicates that PCB has a drinking problem. This Court feels that his adamant denial of the problem and his unwillingness to attend Alcoholics Anonymous or other treatment for the problem is very significant and demonstrates an unfitness to parent.
It is important to note here, that Holly Hammet, attorney for the children, quoted the 1991 Comment to Ch. C. Art. 1138 in her memorandum. The comment states "In the extreme case in which a father proved an established relationship but was found from the evidence to be unfit, the court could issue an instanter order pursuant to Ch. C. Art. 619." In the instant case, although this father does not meet the fitness test, he also does not meet the substantial commitment test and an instanter pursuant to Ch. C. Art. 619 would not be appropriate. This Court feels, however, that this comment contradicts the letter of Ch. C. Art. 1138 which requires that a father acknowledge that he is the father and prove that he made a substantial commitment to his parental responsibilities and prove that he is a fit parent for the child. This would indicate that the father must meet each and every component of this test and failure to do so would result in his parental rights being terminated pursuant to Ch. C. Art. 1138(D).
This comment quoted by the children's attorney does not make practical sense from the standpoint of placement for the child. When a child is surrendered for adoption, the child is taken from the mother and placed with a prospective adoptive couple. Certain stringent time limits are placed upon the father to file his opposition and stringent time limits are placed upon the court to set a hearing. The purpose of these time limits is to assure stability for the child to the greatest possible extent. If the father meets his burden under Ch. C. Art. 1138, then no adoption can go forward without his consent and the child is returned to his custody. Therefore, in the short span of two or three months, an infant can go from the mother's arms, to a prospective adoptive parent's arms and finally to a father's arms. To further complicate this procedure by placing the child in the hands of the State would not, in the opinion of this Court be in the child's best interest.
The Comment quoted by the children's attorney contemplates that the father proved his substantial commitment to parental responsibilities and in the instant matter, PCB did not meet that burden. Therefore, it would be inappropriate to consider an instanter pursuant to Ch. C. Art. 619.
In conclusion, PCB failed to prove by a preponderance of the evidence that he established a substantial commitment to his parental responsibilities and he failed to prove that he is fit to parent these children. Accordingly, this Court finds that his parental rights should be terminated and the adoption can proceed.
NOTES
[1] In keeping with the confidentiality requirements of adoption proceedings, we designate by initials all persons whose identity is relevant to the identity of the children.
[2] Art. 619 provides for issuance of instanter orders of custody where there are "reasonable grounds to believe that the child is in need of care and that emergency removal is necessary to secure the child's protection." La. Ch.C. Art. 619(A). In such cases the court may issue an order directing that the child be taken into the custody of the state. La. Ch.C. Art. 619(C).
[1] The trial court's reasons erroneously inserted the text from another article at this point. We have substituted the applicable text of Art. 1137.