# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 23-548

D. A. B.

**VERSUS**

C. G. W.

********** 

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 126999
HONORABLE KEITH RAYNE JULES COMEAUX, DISTRICT JUDGE

**********

## ELIZABETH A. PICKETT
## CHIEF JUDGE

**********

Court composed of Elizabeth A. Pickett, Candyce G. Perret, and Sharon Darville Wilson, Judges.

**AFFIRMED.**

**Heather Duhon Moore**
**Attorney at Law**
**112 Church Alley**
**New Iberia, LA 70560**
**(337) 321-9245**
**COUNSEL FOR DEFENDANT- APPELLANT:**
     **C.G.W.**

**Glenda Huddleston**
**Decuir & Huddleston**
**214 E. Washington St.**
**New Iberia, LA 70560**
**(337) 365-2336**
**COUNSEL FOR PLAINTIFF- APPELLEE:**
     **D.A.B.**

**PICKETT, Chief Judge.**

C.W. appeals the judgment of the trial court granting sole custody of G.B. to his biological mother, D.B.

### FACTS

C.W. and D.B. began a same-sex romantic relationship in 2003. G.B. was born April 16, 2013, to D.B after she underwent in vitro fertilization treatment to become pregnant. The parties signed a co-parenting agreement on July 4, 2013. The couple purchased a home together and moved into the home in May 2014. C.W. and D.B. separated in June or July 2014.

While still in a relationship with D.B., C.W. began an online relationship with a woman named B.D. B.D. moved to Louisiana to live with C.W. by the end of 2014. According to D.B., the relationship between C.W. and G.B. "fizzled out" when B.D. moved to Louisiana.

Citing the provisions of the co-parenting agreement, D.B. filed a Rule for Child Support in the district court in September 2015. C.W. filed an answer and a reconventional demand seeking custody. The parties ultimately entered into a Consent Judgment signed on October 29, 2015. The judgment specified that the parties would have joint custody and designated D.B. as the domiciliary parent. The judgment ordered C.W. to pay child support and specified visitation every other weekend, every Wednesday, and on certain holidays. The consent judgment also specified that C.W. was required to exercise custody outside of the presence of B.D.

*Obergefell v. Hodges*, 576 U.S. 644, 135 S.Ct. 2584 (2015), which held that there was a constitutional right for people of the same sex to marry each other, was decided by the Supreme Court on June 26, 2015. At some point after that date,

C.W. married B.D. According to C.W.'s testimony, they were married for seven or eight months. Six months after the consent judgment, C.W. moved to Washington state to train for a new job with B.D.'s father. After six or seven weeks in Washington C.W. returned to Louisiana, but left B.D. in Seattle, stating she "wasn't going to let her hit me anymore."

C.W. began a romantic relationship with another woman, J.W., in September or October of 2017. They moved in together about a month later. J.W. and C.W. married in December 2019. J.W. testified that she, D.B., and C.W. maintained a cordial relationship until C.W. filed a Motion for Modification of Custody and Contempt in November 2020.

In her motion, C.W. sought to alter the visitation schedule because her new job required a seven-days-on and seven-days-off schedule, which meant that she missed her Wednesday visits half the time. C.W. also alleged that since G.B. began online school because of the COVID pandemic, D.B. had prevented C.W. from involvement in his education. C.W., who carried insurance for G.B. pursuant to the consent judgment, also alleged issues with the use of out-of-network providers. In addition to modification of custody, C.W. sought to hold D.B. in contempt of court for failure to abide by the terms of the consent judgment.

A hearing officer conference was held on January 4, 2021. The hearing officer issued a report on January 6, 2021. Both D.B. and C.W. timely objected to the hearing officer's findings of facts and recommendation. Before a hearing in the district court, C.W. and D.B. entered into a Joint Stipulation and Consent Judgment on March 10, 2021.

The dispute in this appeal arose after two pleadings were filed within days of each other in March 2022. In the first filing, D.B. filed a Rule to Show Cause Why

2

the Consent Judgments Should Not Be Annulled on March 9, 2022. C.W. filed an exception of no cause of action and prescription in response to the nullity action. A hearing was held on the exceptions on April 18, 2022, at the end of which the trial court indicated it would grant the exceptions. The trial court granted the exceptions of no cause of action and prescription and dismissed D.B.'s nullity action by judgment dated May 2, 2022. That decision was not appealed.

In the second filing, C.W. filed a Motion for Contempt and Modification of Custody on March 11, 2022. D.B. filed an Answer and Reconventional Demand on May 1, 2022, by which she sought sole custody. The matter proceeded to trial on July 28–29, 2022.

The court took the matter under advisement. In its reasons for judgment, the trial court found that La.Civ.Code art. 133 applied. Article 133 states:

> If an award of joint custody or of sole custody to either parent would result in substantial harm to the child, the court shall award custody to another person with whom the child has been living in a wholesome and stable environment, or otherwise to any other person able to provide an adequate and stable environment.

Since C.W., the non-parent, failed to show by clear and convincing evidence that substantial harm would result if D.B., the biological mother, was given full custody of G.B., the trial court's inquiry ended. Citing *Cook v. Sullivan*, 20-1471 (La. 9/30/21), 330 So.3d 152, the trial court rejected the idea that there was any Louisiana law, either statutory or jurisprudential, recognizing a *de facto* or psychological parent.

C.W. filed a Motion for a New Trial, which was denied by the trial court on November 29, 2022. C.W. now appeals.

## ASSIGNMENT OF ERROR

C.W. asserts one assignment of error:

1. The trial court applied the wrong legal standard regarding a modification of a third-party custody consent judgment therefore a de novo review of the record is necessary.

## DISCUSSION

The paramount consideration in custody determinations is the best interest of the child. La.Civ.Code art. 131; *Tracie F. v. Francisco D.*, 15-1812 (La. 3/15/16), 188 So.3d 231; *Evans v. Lungrin*, 97-541, 97-577 (La. 2/6/98), 708 So.2d 731. "Every child custody case is to be viewed on its own peculiar set of facts and the relationships involved." *Cook*, 330 So.3d at 157.

We will overturn a trial court's custody determination only if we find the trial court abused its discretion. *Leard v. Schenker*, 06-1116 (La. 6/16/06), 931 So.2d 355.

> However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record and determine a preponderance of the evidence. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts *de novo*.

*Evans*, 708 So.2d at 735 (citations omitted).

D.B. is the mother of G.B., as she gave birth to him. *See* La.Civ.Code art. 184. Under our law, C.W. is not a parent of G.B. She never adopted G.B. She was never married to D.B., so any presumption of parentage would not apply. *See*

4

La.Civ.Code arts. 185 and 186. Thus, this case presents as a custody dispute between a parent and a non-parent.

C.W. argues that the holding in *Cook* does not apply to this case, because *Cook*, 330 So.3d 152, involved an initial custody determination between a parent and a non-parent. In *Cook*, Sharon Sullivan and Billie Cook were long-term same-sex partners. Sullivan gave birth to a child in December 2009, and the child and the women lived together until their relationship ended in February 2013. After their separation, the women shared custody of the child until July 2016, when Sullivan terminated the arrangement. Cook filed a petition to establish parentage, custody, and support in January 2017.

The trial court found that Cook was a legal parent and awarded joint custody to Sullivan and Cook, with Sullivan as the domiciliary parent. The court of appeal reversed, and the supreme court granted writs. The supreme court found that Louisiana law only considers Sullivan a parent to the child at issue, and Cook is a non-parent. Upholding the decision of the appellate court, the supreme court held, "Since this is an initial custody dispute between a non-parent and parent, Billie [the non-parent] is required to prove by clear and convincing evidence that an award of sole custody to Sharon [the biological mother] would result in substantial harm to the child under La.Civ.Code art. 133." *Cook*, 330 So.3d at 159. Because Cook failed to show that substantial harm would result to the child if Sullivan were awarded sole custody, the trial court erred in analyzing the best interest of the child under La.Civ.Code art. 134. *Id.*

Unlike the mother in *Cook*, in this case, the mother, D.B., agreed to two different consent judgments allowing C.W. to exercise custody/visitation. C.W. argues that this is a distinguishing fact that makes *Cook* inapplicable to this case.

5

Instead, she argues, we should apply the rule enunciated by the supreme court in *Tracie F.*, 188 So.3d 231.

In *Tracie F.*, the father of the child agreed to a consent judgment allowing the maternal grandmother to act as domiciliary parent. (At all times, the biological mother was still alive.) The father then filed suit to annul the stipulated judgment. He later abandoned the nullification theory and asked the court to modify custody. As an initial matter, the supreme court in *Tracie F.* explained the paramount importance of a biological parent's rights with respect to their children:

> [B]iological parents have constitutionally protected rights regarding their children. Further, as this court has explained, the Fourteenth Amendment to the United States Constitution protects a biological parent's due process right to "the companionship, care, custody, and management" of a child. *See In re Adoption of B.G.S.*, 556 So.2d 545, 549 (La.1990) (citing *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and *Lassiter v. Department of Social Services*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)). Similarly, "we have implicitly recognized that the reciprocal rights and obligations of natural parents and children are among those unenumerated rights retained by individuals pursuant to La. Const. art. 1, § 24." *In re Adoption of B.G.S.*, 556 So.2d at 551. A biological parent cannot be deprived of these and other related rights without a procedure that adequately balances three factors:
>
>> [F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
>
> *Id.*, 556 So.2d at 552.

*Tracie F.*, 188 So.3d at 242.

Finding the trial court and the appellate court applied the incorrect burden of proof and the incorrect law, the supreme court ruled that the proper rule where a

parent seeks to modify a consent judgment which afforded some custody rights to a non-parent is the rule enunciated in *Evans*, 708 So.2d 731, stating:

> For the reasons discussed in this opinion, we are especially guided by La. C.C. art. 131 and the legislative comments to its revision, and we hold that the overarching inquiry in an action to change custody is "the best interest of the child." Moreover, consistent with our prior jurisprudence regarding stipulated custody awards, we further hold that a biological parent with joint custody, who seeks modification of a stipulated custody award to obtain greater custodial rights, must prove: 1) there has been a material change in circumstances after the original custody award; and 2) the proposed modification is in the best interest of the child. *See Evans v. Lungrin*, 97–0541, 97–0577, p. 13 (La.2/6/98), 708 So.2d 731, 738; *cf. Bergeron v. Bergeron*, 492 So.2d 1193 (La.1986).

*Tracie F.*, 188 So.3d at 235.

Ultimately, the court ruled that the father of the child in *Tracie F.*, who had increased his involvement in the child's life, had proven a material change in circumstances. The court found, however, that the best interest of the child would be served by maintaining joint custody with the maternal grandmother and the father, with the maternal grandmother continuing as the domiciliary parent.

The first circuit has applied this holding in a case involving same-sex partners, albeit before the supreme court issued its ruling in *Cook*. In *In re J.E.T.*, 16-384 (La.App. 1 Cir. 10/31/16), 211 So.3d 575, the adoptive mother of a child filed suit to modify a stipulated judgment of custody which granted joint custody to herself and her former same-sex partner, who had not adopted the child. After the relationship ended and the adoptive mother married a man, the adoptive mother filed suit to modify the stipulated custody decree, arguing that she was the only legal parent of the child, and, therefore, she should be given sole custody. The court of appeal, citing *Tracie F.*, found that the adoptive mother had the burden of proving that there was a material change in circumstances since the consent

judgment and that a change of custody was in the best interest of the child. Finding the adoptive mother failed to meet her burden of proof, the court affirmed the trial court's ruling denying the change in custody and denying the application to relocate the child to Texas.

From the jurisprudence, we find the consent judgments agreed to by D.B., which gave C.W. some custodial rights, make the supreme court's holding in *Cook* inapplicable to this case. To the extent that D.B. sought, in her reconventional demand, to modify the consent judgment so that she gets sole custody of G.B., we find the law applicable to making this determination is the rule found in *Tracie F.*, 188 So.3d 231. Thus, we find the trial court committed legal error in its finding that C.W. was required to prove that sole custody to D.B. would result in substantial harm to G.B. We must, then, conduct a de novo review of the record to determine if "1) there has been a material change in circumstances after the original custody award; and 2) the proposed modification is in the best interest of the child." *Id.* at 235.

This court has held that a material change in circumstance is a change that "negatively impact[s] the welfare of the child." *LeBlanc v. LeBlanc*, 06-1052, p. 9 (La.App. 3 Cir. 2/14/07), 951 So.2d 500, 507, *writ denied*, 07-562 (La. 4/5/07), 954 So.2d 146. Since the second consent judgment, we find D.B. showed a material change in circumstances. The parties testified that D.B.'s relocation to Youngsville makes visitation every Wednesday evening unfeasible, and that increasingly G.B. would prefer to play with his friends than go to visitation with C.W. On multiple occasions, C.W., in contravention of D.B.'s express directions, took G.B. into public places during the pandemic. D.B. clearly explained that G.B.'s history of asthma made caution very important during the height of the

8

COVID pandemic. Nevertheless, D.B. testified that C.W. took G.B. to play laser tag, to go bowling, and to a Hooters restaurant. D.B. and C.W. also could not reach an agreement about the appropriate tutor for G.B. when he fell behind in school after being home-schooled for a time during the pandemic. Additionally, J.W. testified that the parties argued over medical reimbursements beginning in March 2022. Regarding communication with C.W., D.B. testified, "We hardly even speak to each other. When we do speak, it does not go well." This continued animosity has resulted in G.B. entering counseling, which became another avenue of contention between D.B. and C.W. C.W. testified that while she did not object to the counseling, she was not told about it until after the sessions started.

We find this evidence, taken as a whole, indicates that there has been a material change in circumstances which has had a negative impact on G.B. Thus, we proceed to the second prong of the analysis under *Evans*.

In determining the best interest of a child in a custody dispute, we look first to La.Civ.Code art. 134, which instructs courts to look to all relevant factors, including:

> (1) The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration.
>
> (2) The love, affection, and other emotional ties between each party and the child.
>
> (3) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
>
> (4) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
>
> (5) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(6) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(7) The moral fitness of each party, insofar as it affects the welfare of the child.

(8) The history of substance abuse, violence, or criminal activity of any party.

(9) The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody.

(10) The home, school, and community history of the child.

(11) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party.

(13) The distance between the respective residences of the parties.

(14) The responsibility for the care and rearing of the child previously exercised by each party.

At trial, D.B. testified that G.B. returned home on Monday after school from a weekend visit with C.W. in November 2021 with a bruise on his leg. When asked, G.B could not explain the bruise. D.B. called C.W., who claimed to be unaware of the source of the injury, but stated that C.W. fell out of a chair, which may have been the cause. G.B. confirmed that he thought he fell out of a chair. Reviewing her text messages with C.W. in March 2022, D.B. discovered a conversation with C.W. in which C.W. acknowledged spanking G.B. during that November weekend.

C.W. testified that she did spank G.B. on the behind once on that Friday afternoon in November after she picked him up from school. G.B. had earned a

demerit for his behavior at school.  C.W. stated that she swatted him once on the behind while he was fully clothed.  C.W. made D.B. aware at the time that she had spanked G.B.  C.W. testified that while at her sister's house the next day, G.B. fell out of a chair.  He "cried a little bit."  She consoled him, and soon he jumped off her lap to go continue playing with the other children.  C.W. did not notice a bruise on G.B.'s leg during the visit.  C.W. first learned of the bruise when D.B. sent her a text message on Monday evening.

This is the only incident in the record which arguably rises to the level of abuse as defined by La.Ch.Code art. 603.  The evidence is insufficient to prove by a preponderance of the evidence that C.W. ever abused G.B.  Thus, this first factor in La.Civ.Code art. 134 is not applicable in this case.

While both parties love G.B., the record is clear that D.B. has consistently placed her love for G.B. ahead of any other relationships in her life, particularly romantic relationships.  C.W. began a relationship with B.D., a person with a criminal record and an anger problem.  C.W. then married B.D. even though the parties agreed in the first consent judgment that C.W. could not exercise visitation in the presence of B.D.  C.W. also testified that she left B.D. because B.D. was physically abusive.

G.B. has lived with D.B. his entire life.  D.B. has a support system that includes her mother and her grandparents, all of whom have cared for G.B. since he was born.  D.B.'s grandfather has clearly formed a special bond with G.B.  D.B. resides in her new home in Youngsville with her grandparents.  C.W. has been married twice since the end of her relationship with D.B.

The record does show that C.W. and D.B. have both cared for G.B.'s material needs, including food, clothing, and medical needs.  It is also clear from

11

the record that D.B. has always been the person who has taken G.B. to the doctor. She insures that he has the medication he needs, particularly for his asthma, which at times has been severe. For these reasons, factor (4) weighs in favor of D.B.

Factors (2), (3), (5), (6), (7), (10) and (14) of La.Civ.Code art. 134 all weigh in favor of D.B. having sole custody of G.B. There is no evidence in the record of G.B.'s preference, so factor (11) is not relevant here. Neither D.B. nor C.W. has fostered a relationship with the other, so factor (12) does not inure to the benefit of either party. Taken as a whole, we find that the evidence supports a finding that it is in the best interest of G.B. that D.B. be awarded sole custody. The inability of the parties to co-parent is a factor in this determination.

## CONCLUSION

While we find the trial court's legal analysis incorrect, we affirm the judgment of the trial court in its entirety. Costs of this appeal are assessed to C.W.

**AFFIRMED.**